**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

_____
　　　　　　　　　　　　　　　　　　　　　　　)
In re NATIONAL CITY CORPORATION　　　)　　Master File No: 08 CV 7000
SECURITIES, DERIVATIVE & ERISA　　　)　　Judge Patricia A. Gaughan
LITIGATION　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　)
This Document Relates to:　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　)　　**CONSOLIDATED COMPLAINT**
ERISA Cases　　　　　　　　　　　　　)　　**FOR VIOLATIONS OF ERISA**
　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　)
_____)

Plaintiffs James Elsinghorst and Barbara Grosick ("Lead Plaintiffs"), Ella R. Whitlow, Sharon A. Deucher, Robert Steinberg, Loretta D. Rogers, Rodolfo Ranallo, Jr., Rita Klabenesh, Robert Huenefeld, Charles C. Gunning, George Rithianos, and Deborah Douglas (collectively "Plaintiffs"), participants of the National City Savings and Investment Plan (hereinafter the "Plan") during the proposed Class Periods (defined below), on behalf of the Plan, themselves and classes of all others similarly situated by their attorneys, allege the following for their Consolidated Complaint (the "Complaint"). The allegations contained herein are based on the investigation of counsel, except for those allegations pertaining to the Plaintiffs, which are based upon personal knowledge. Plaintiffs may, after discovery and/or disclosure proceedings in this case, seek leave to amend this Complaint to add new parties or claims.

## INTRODUCTION

1.       This is a class action brought pursuant to §§ 409, 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1109, 1132, against Defendants, fiduciaries of the Plan.

2.       Plaintiffs were participants in the Plan during the Class Periods, during which time the Plan held interests in National City Corporation's (hereinafter "National City" or the "Company") common stock.   Further, Plaintiffs' retirement investment portfolios in the Plan during the Class Periods included National City stock.

3.       401(k) plans confer tax benefits on participating employees to incentivize saving for retirement and/or other long-term goals.   An employee participating in a 401(k) plan may have the option of purchasing the common stock of his or her employer, often the sponsor of the plan, for part of his or her retirement investment portfolio. Common stock of National City was one of the investment alternatives of the Plan throughout the Class Period.

4.       Plaintiffs allege that Defendants, as "fiduciaries" of the Plan as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their duties to them and to the other participants and beneficiaries of the Plan in violation of ERISA §§ 404(a), 405, 29 U.S.C. §§ 1104(a), 1105, particularly with regard to the Plan's heavy holdings of National City stock.

5.       Specifically, Plaintiffs allege in Count I that Defendants, each having certain responsibilities regarding the management and investment of Plan assets, breached their fiduciary duties to them, the Plan and proposed Class by failing to prudently and loyally manage the Plan's investment in Company securities by (1)

continuing to offer National City common stock as a Plan investment option when it was imprudent to do so; and (2) maintaining the Plan's pre-existing heavy investment in National City equity when Company stock was no longer a prudent investment for the Plan.   These actions/inactions run directly counter to the express purpose of ERISA pension plans, which are designed to help provide funds for participants' retirement.  See ERISA § 2, 29 U.S.C. § 1001 ("CONGRESSIONAL FINDINGS AND DECLARATION OF POLICY").

6.    Plaintiffs' Count II alleges that Defendants failed to adequately inform the Plan's Participants about the true risk and return characteristics of National City's stock, including by failing to adequately inform the Participants about the true state of affairs with respect to National City's subprime mortgage operations and originations and National's other highly-risky lending practices and National City's exposure to massive losses in connection with those practices.

7.    Plaintiffs' Count III alleges that certain Defendants breached their fiduciary duties by failing to adequately monitor other persons to whom management/administration of Plan assets was delegated, despite the fact that such Defendants knew or should have known that such other fiduciaries were imprudently allowing the Plan to continue offering National City stock as an investment option and investing Plan assets in National City stock when it was no longer prudent to do so.

8.    Plaintiffs' Count IV alleges that certain Defendants failed to avoid or ameliorate inherent conflicts of interests which crippled their ability to function as independent, "single-minded" fiduciaries with only the Plan's and their participants' best interests in mind.

3

9.     Plaintiffs' Count V alleges that the Administrative Committee Defendants (defined herein breached their fiduciary duties by authorizing or causing the Plan to invest in Allegiant Funds and to purchase products and services from National City's subsidiaries and affiliates on terms, and under circumstances, prohibited by ERISA.

10.     Plaintiffs' Count VI alleges that the Administrative Committee Defendants knew or should have known that the Plan was engaged in transactions which constituted sales or exchanges of property between the Plan and parties-in-interest in violation of Sections 406(a) and (b) of ERISA.

11.     Plaintiffs allege that Defendants allowed the heavy imprudent investment of the Plan's assets in National City equity throughout the Class Period despite the fact that they clearly knew or should have known that such investment was imprudent due to, as explained in detail below and among other things, the fact that: (a) the Company remained exposed to substantial subprime mortgage-related losses, because, in part, of its acquisition of First Franklin Financial Corp ("First Corp.") and the subprime loan originations made by First Franklin and the implementation of so-called "affordability products," and despite its disposition of First Franklin announced in September 2006; (b) the Company's enormous market expansion in the State of Florida left it overexposed to losses, as the mortgage and housing markets suffered extreme downturns;   (c) the Company had failed to adequately and timely record accruals for losses from its exposure to delinquent mortgages; (d) National City engaged in highly risky lending practices, such as Construction Loans with no money down and Home Equity Loans with no income verification requirement, which practices were not limited to subprime borrowers and which predictably led to massive loan losses for the Company, and (e) as a

consequence of the above, the Company's stock price was artificially inflated; and (e) heavy investment of retirement savings in Company stock would inevitably result in significant losses to the Plan, and consequently, to its participants.

12.     This action is brought on behalf of the Plan and seeks losses to the Plan for which Defendants are liable pursuant to ERISA §§ 409, 502, 29 U.S.C. §§ 1109, 1132. Because Plaintiffs' claims apply to the Plan, inclusive of all participants with accounts invested in Company stock during the Class Periods, and because ERISA specifically authorizes participants such as Plaintiffs to sue for relief to the Plan from breaches of fiduciary duty such as those alleged herein, Plaintiffs bring this as a class action on behalf of the Plan and all participants and beneficiaries of the Plan during the proposed Class Periods.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

14.     Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside or maintain their primary places of business in this district.

15.     More specifically, this district is an appropriate venue for this action because, on a recent Form 5500 annual filings with the Internal Revenue Service ("IRS") and Department of Labor ("DOL") ("Form 5500"), the address listed for the sponsor of the Plan is in this district. In addition, the corporate headquarters of Defendant National City is located in this district. Accordingly, it is likely that many of the parties and

potential witnesses, including corporate executives and many of the Plan's participants, are located in or within close proximity to this district.

16.     More specifically, this district is an appropriate venue for this action because Defendant National City, which is both the Plan Administrator and the "named fiduciary" of the Plan under ERISA, has its headquarters in this District.  *See* The National City Savings and Investment Plan, as amended and restated effective January 1, 2001 ("Plan Document") § 1.1(11), NCC-ERISA 00013 (naming National City as Plan Administrator and a Named Fiduciary).  A true and correct copy of the Plan Document with Amendments is attached hereto and incorporated herein as Exhibit "A."

## PARTIES

**Plaintiffs**

17.     Plaintiffs James Elsinghorst and Barbara Grosick, Ella R. Whitlow, Sharon A. Deucher, Robert Steinberg, Loretta D. Rogers, Rodolfo Ranallo, Jr., Rita Klabenesh, Robert Huenefeld, Charles C. Gunning, George Rithianos, and Deborah Douglas were "participants" in the Plan within the meaning of §3(7) of ERISA, 29 U.S.C. §1102(7).

18.     Plaintiff James Elsinghorst is a resident of the State of Ohio.  Plaintiff was employed by National City (or a subsidiary or division of National City) for approximately ten years until approximately 2006, and maintained an investment in National City common stock in his individual account in the Plan during the Class Period.  Plaintiff Elsinghorst is a "participant" in the Plan within the meaning of §3(7) of ERISA, 29 U.S.C. §1102(7).

19.     Plaintiff Barbara Grosick is a "participant" in the Plan within the meaning of §3(7) of ERISA, 29 U.S.C. §1102(7), and held National City Stock in her retirement

investment portfolio during the Class Period.  Grosick retired on June 11, 2007 after 35 years of employment at National City as a Service Coordinator.

20.     Plaintiff Ella R. Whitlow is a current participant in the Plan.  Whitlow invested in National City Stock during the Stock Period and in Allegiant Funds during the Allegiant Fund Period.  Whitlow was hired by the Company on April 15, 1974 and retired July 31, 1993.  Whitlow participated in the Plan and invested in National City Stock during the Stock Period.  Whitlow continues to be invested in National City Stock in the Plan.  Whitlow invested in the National Stock Fund ("National Stock Fund"), a unitized collective trust that invested almost exclusively in National Stock.  During the Stock Period, Whitlow suffered approximately one thousand dollars in National Stock Fund losses.

21.     Plaintiff Sharon A. Deucher was hired by the Company on January 25, 1988 and ceased her employment with the Company on July 16, 2007, just shy of twenty years of service.  Deucher participated in the Plan and invested in National Stock during the Stock Period and in Allegiant Funds during the Fund Period.  Deucher invested in the Allegiant Large Cap Growth Fund, Allegiant Large Cap Value Fund, and Allegiant MLF Small Cap Value Fund.  Deucher also invested in the National Capital Preservation Fund for Retirement Trusts, a unitized collective trust established and maintained by the Company and its subsidiaries and affiliates.  Deucher also invested in the National Stock Fund.

22.     Plaintiff Robert Steinberg is an active participant in the Plan.  Steinberg invested in National City Stock during the Stock Period and in Allegiant Funds during the Fund Period.  Steinberg was hired by the Company on or about June 13, 1996 and retired

from his employment with the Company on July 15, 2007.  Steinberg continues to be invested in National City Stock and Allegiant Funds in the Plan.  Steinberg invested in the Allegiance Balanced Allocation Fund, Allegiant Large Cap Value Fund, Allegiant MLF Small Cap Value Fund, Allegiant Money Market Fund, and Allegiant Stable Value Fund.  Steinberg also invested in the National Capital Preservation Fund for Retirement Trusts, a unitized collective trust established and maintained by the Company and its subsidiaries and affiliates.  Steinberg also invested in the National Stock Fund.  During the Stock Period, Steinberg suffered approximately forty-four thousand dollars in National Stock Fund losses.

23.    Plaintiff Loretta D. Rogers was hired by the Company on February 26, 2006, and is still employed by the Company.  Rogers participated in the Plan and invested in National Stock during the Stock Period and in Allegiant Funds during the Allegiant Fund Period.  Rogers continues to be invested in Allegiant Funds in the Plan. Rogers invested in the Allegiant Mid Cap Value I Fund, Allegiant Multi-Factor Small Cap Value Fund, and other Allegiant Funds.  Rogers also invested in the National Stock Fund.   During the Stock Period, Rogers suffered approximately one thousand-five hundred dollars in National Stock Fund losses.

24.    Plaintiff Rodolfo Ranallo, Jr. is a resident of the Commonwealth of Pennsylvania.  Plaintiff is a former National employee and is a participant in the Plan.

25.    Plaintiff Rita Klabenesh is a resident of the State of Washington.  Plaintiff is a former National employee and is a participant in the Plan.

26.    Plaintiff Robert Huenefeld is a resident of the State of Florida.  Plaintiff is a former National employee and is a participant in the Plan.

27.     Plaintiff Charles C. Gunning is a resident of the State of Illinois.  Plaintiff is a former National employee and is a participant in the Plan.

28.     Plaintiff George Rithianos is a participant in the Plan.   Rithianos participated in the Plan and invested in National Stock during the Stock Period and in Allegiant Funds during the Fund Period.

29.     Plaintiff Deborah Douglas is a former employee of National City and a current participant in the Plan, within the meaning of ERISA §3(7) and 502(a), 29 U.S.C. §1102(7).  Deborah Douglas held National stock in her individual Plan account during the Class Period.

**Defendants**

**National City**

30.     Defendant National City is a Delaware corporation with its principal place of business located at 1900 East Ninth Street, Cleveland, Ohio 44114.

31.     According to its Form 10-K filed with the Securities and Exchange Commission for the fiscal year ended 2006 ("2006 10-K"), National City is a $140 billion financial holding company that operates through an extensive distribution network in Ohio, Florida, Illinois, Indiana, Kentucky, Michigan, Missouri and Pennsylvania, and also conducts selected lending and other financial services businesses on a nationwide basis.  Its primary businesses include commercial and retail banking, mortgage financing and servicing, consumer finance and asset management.   National City and its subsidiaries had 31,270 full-time-equivalent employees as of December 31, 2006.  *Id.*

32.     National City is the named Plan Sponsor and Plan Administrator for the Plan.  *See* Plan Document § 1.1(2), NCC-ERISA 00010.   Further, the Company is a

named fiduciary of the Plan.  *See* Plan Document, § 10.2 NCC-ERISA 00105.  The Company exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

33.   The Company bears ultimate responsibility for the administration of the Plan.  *See* Plan Document § 10.1, NCC-ERISA 00105.  The Company administers the Plan through its Board of Directors, as well as officers and employees including, without limitation, its Chief Executive Officer ("CEO"), members of the Administrative Committee (defined below) and other employees appointed by the Company to perform Plan-related fiduciary functions in the course and scope of their employment.

34.   National City had, at all applicable times, effective control over the activities of its directors, officers and employees, including over their Plan-related activities.  Through its Board of Directors or otherwise, National City had the authority and discretion to hire and terminate said officers and employees.  In addition, the Company and/or its Board of Directors also had the authority and discretion to appoint, monitor, and remove individual directors, officers and employees from their individual fiduciary roles with respect to the Plan.  By failing to properly discharge their fiduciary duties under ERISA, the director, officer and employee fiduciaries breached duties they owed to the Plan, its participants and their beneficiaries.  Accordingly, the actions of the Board of Directors, the Administrative Committee and/or any other employee fiduciaries are imputed to the Company under the doctrine of *respondeat superior*, and the Company is liable for these actions.

**The Director Defendants**

35.     Members of the Board of Directors (the "Board") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

36.     Indicative of its authority, the Board was responsible for appointing, monitoring and removing members of the Administrative Committee (defined below). *See* Plan Document § 10.6, NCC-ERISA 00107.

37.     Defendant David A. Daberko ("Daberko") served as the Company's Chief Executive Officer ("CEO") and Chairman of the Board of Directors during the Class Periods.  Defendant Daberko was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

38.     Defendants Daberko and any Director John Doe Defendants are hereinafter collectively referred to as the "Director Defendants."

**The Administrative Committee Defendants**

39.     The Administrative Committee of the National City Savings and Investment Plan ("Administrative Committee") is delegated the day-to-day responsibility for the administration of the Plan and is a named fiduciary of the Plan.  *See* Plan Document § 10.2, NCC-ERISA 00105.

40.     The Administrative Committee had the exclusive authority and responsibility to appoint and revoke the appointment of an Investment Manager[1] under the Plan with respect to the Company Stock Fund.  *See* Plan Document § 8.1(1), NCC-ERISA 00100; *see also* Plan Amendment No. 10 § 8.1(1),[2] NCC-ERISA 00411.  The Investment Manager appointed by the Administrative Committee has authority over the investment and reinvestment of the Company Stock Fund and is also a named fiduciary of the Plan.  *See* Plan Document § 8.1(2), NCC-ERISA 00100 and §10.2, NCC-ERISA 00105.

41.     Further, the Administrative Committee and its members were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

42.     Defendant Jon N. Couture ("Couture") was a Senior Vice President and the Company's Director of Human Resource during the Class Period.  Upon information and belief, Defendant Couture was also a member of the Administrative Committee.  Defendant Couture signed the 2006 Form 5500 as the "Plan Administrator."

**Trustee**

43.     The trustee is National City Bank, a subsidiary of National City.  *See* Trust for National City Savings and Investment Plan ("Trust Agreement") at 1 NCC-ERISA

---

[1] The investment manager(s) responsible for the Company Stock Fund, and the extent of their actual authority, is currently unknown to Plaintiff.  As such, Plaintiff reserves his right to amend this complaint once such details become known to Plaintiff through the course of discovery.

[2] Effective January 1, 2007, the Company assumed the exclusive responsibility for appointing the Investment Manager for the Plan.

00456.   A true and correct copy of the Trust Agreement is attached hereto and incorporated herein as Exhibit "B."

44.   The Trustee was a named fiduciary of the Plan.  *See* Plan Document § 10.2, NCC-ERISA 00105.

45.   Further, "responsibility for the management and control of all or part of the Trust Fund (including the power to acquire or dispose of its assets shall be vested in the Trustee.  *See* Trust Agreement at 3, NCC-ERISA 00458.

**Additional "John Doe" Defendants**

46.   Without limitation, unknown "John Doe" Defendants 1-10 include other individuals, including members of the Board, the Administrative Committee and investment managers, as well as other Company officers and employees who are or were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.   The identities of the John Doe Defendants are currently unknown to Plaintiffs; once their identities are ascertained, Plaintiffs will seek leave to join them to the instant action under their true names.

## THE PLAN

47.   The Plan is an "employee pension benefit plan," as defined by § 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A).   Specifically, the Plan is a "defined contribution plan" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).   The Plan is a legal entity that can sue and be sued.   *See* ERISA § 502(d)(1).   However, in a breach of fiduciary duty such as this, the Plan is neither a defendant nor a plaintiff.   Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants and beneficiaries.

48.     According to the Company, "[t]he [Plan] makes it easy to save for your future."  *See* Savings and Investment Plan Summary Plan Description ("SPD") at 9-6, NCC-ERISA 00430.  A true and correct copy of the SPD is attached hereto and incorporated herein as Exhibit "C."  The Plan purportedly consists of an Employee Stock Ownership Plan (ESOP) component and a non-ESOP component.

49.     Certain ERISA plans contain an ESOP component that is intended to be deemed an "eligible individual account plan" ("EIAP") designed to invest primarily in employer securities pursuant to ERISA § 407(d)(6).  (ERISA plans otherwise may not hold employer securities.)  Although the Plan includes a purported ESOP component,[3] upon information and belief, the Plan does not satisfy all of the statutory and regulatory mandates with respect to ESOP or EIAP design and/or operation.  Furthermore, the purported ESOP component does not relieve Defendants from their duties of prudence and loyalty.

50.     All National City employees and employees of participating National City subsidiaries are eligible to participate in the Plan, as soon as they are at least 21 years of age and have completed thirty (30) days of service. See SPD at 9-2, NCC-ERISA 00426.

51.     The trustee for the assets of the Plan is National City Bank, a subsidiary of National City.  *See* Trust Agreement at 1, NCC-ERISA 00456.

---

[3]  "The ESOP Feature is intended to qualify as a stock bonus plan under Code Section 401(a) and as an employee stock ownership plan under Code Section 4975(e)(7).  The ESP Feature is designed to invest primarily in 'qualifying employer securities," as defined in Code Sections 4975(e)(8) and 409(l) and ERISA Section 407(d)(5).  *See* Plan Article XVI 16.2(3); *see also* SPD 9-10, NCC-ERISA 00434. "The portion of the Plan invested in the National City Corporation Stock Fund constitutes an Employee Stock Ownership Plan (ESOP).:

**Participant Contributions**

52.     The Plan allows participant to build income for the future from two sources:  1) payroll deductions (known as deferrals) to a Plan account on a pre-tax basis; and 2) matching contributions to a Plan account made by the Company.  *See* SPD at 9-6, 9-7, NCC-ERISA 00430-00431.

53.     More specifically, participants may make tax deferred contributions of 1% to 20% of their eligible compensation, up to the limits imposed by the Internal Revenue Service.  See SPD at 9-6, NCC-ERISA 00430.  Participants can also direct contributions in 1% increments between several investment options, the majority of which are Allegiant Funds.

54.     Participants direct their contributions in 1% increments among various investment options offered by the Plan.  As of December 31, 2006, the Plan offered 14 investment options, including a fund composed of National City common stock.  *See* SPD at 9-10, NCC-ERISA 00434; s*ee* also 2006 Form 11-K, page 8.  A true and correct copy of the 2006 Form 11-K is attached hereto and incorporated herein as Exhibit "D." Seven of the funds were managed by Company subsidiaries and affiliates:  National City Capital Preservation Fund ("Preservation Fund"); Allegiant Advantage Institutional Money Market Fund; Allegiant Large Cap Growth Fund; Allegiant Mid Cap Value I Fund; Allegiant Multi-Factor Small Cap Value Fund; Allegiant Balanced Allocation Fund; and Allegiant Large Cap Value Fund.  All of these funds are managed by parties-in-interest or fiduciaries to the Plan.

55.     The Company, through its subsidiary Allegiant Asset Management Company ("Allegiant Management"), serves as investment advisor to the investment portfolios of the Preservation Fund and the Allegiant Funds.

56.     Between 2001 and 2007, the Plan's investments in the Preservation Fund, Allegiant Funds, and the NCC Stock Fund comprised more than 70% of the Plan's assets.

**Company Contributions**

57.     Participants are eligible to receive matching Company contributions beginning on the first day of the month following the participants' first anniversary of employment.  *See* SPD at 9-7, NCC-ERISA 00431.

58.     The monthly matching contribution is equal to 115% of the participant's contribution up to 6% of the participant's combined cash compensation.  *See* SPD at 9-7, NCC-ERISA 00431; *see also* 2006 Form 11-K at 8.

59.     Matching contributions are automatically invested in the National City Corporation Stock Fund.   *See* SPD at 9-7, NCC-ERISA 00431.   Such matching contributions are made each pay period.  *See* 2006 Form 11-K at 8.

60.     All Participants are immediately 100% vested in all amounts credited to their accounts, including their own contributions, employer matching contributions and any earnings thereon.  *See* SPD at 9-9, NCC-ERISA 00433; *see also* 2006 Form 11-K at 8.

61.     As of December 31, 2006, $911,133,373[4] in Plan assets was invested in the Company Stock Fund.

---

[4] *See* the Plan's Form 5500 for Plan year 2006.  A true and correct copy of the 2006 Form 5500 is attached hereto and incorporated herein as Exhibit "E."

## CLASS ACTION ALLEGATIONS

62.     Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of themselves and the following two classes:

(a)     All persons who were participants in or beneficiaries of the Plan, at any time between September 5, 2006 and the present (the "Class Period") and whose Plan accounts included investments in National City common stock ("Stock Class"); and

(b)     All persons who were participants in or beneficiaries of the National City Savings and Investment Plan, excluding the Defendants, whose accounts in the Plan were invested in Allegiant Funds from March 25, 2002, to the present (the "Fund Period" or "Allegiant Fund Period") ("Allegiant Fund Class").

63.     The members of the Classes are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe there are several tens of thousands of members of the Stock Class who participated in, or were beneficiaries of, the Plan during the Class Period and whose Plan accounts included investment in National City stock.[5]

64.     Common questions of law and fact exist as to all members of the Stock Class and predominate over any questions affecting solely individual members of the Stock Class.  Among the questions of law and fact common to the Stock Class are whether:

---

[5] *E.g.*, the Plan's Form 5500 for Plan year 2006 indicates that, at the end of that year, the Plan had approximately 41,153 participants.

> (a)   Defendants each owed a fiduciary duty to the Plan, Plaintiffs and members of the Classes;
>
> (b)   Defendants breached their fiduciary duties to the Plan, Plaintiffs and members of the Classes by failing to act prudently and solely in the interests of the Plan and the Plan's participants and Beneficiaries;
>
> (c)   Defendants violated ERISA; and
>
> (d)   the Plan and members of the Classes have sustained damages and, if so, what is the proper measure of damages.

65.     Plaintiffs' claims are typical of the claims of the members of the Classes because Plaintiffs, the Plan and the other members of the Classes each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

66.     Plaintiffs will fairly and adequately protect the interests of the members of the Classes and have retained counsel competent and experienced in class action, complex, and ERISA litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Plan or the Classes.

67.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Classes would create a risk of adjudications with respect to individual members of the Classes which would, as a practical matter, be dispositive of the interests of the other members not

parties to the actions, or substantially impair or impede their ability to protect their interests.

68.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Classes would create a risk of establishing incompatible standards of conduct for Defendants; and (ii) Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Classes as a whole.

## DEFENDANTS' FIDUCIARY STATUS

69.     During the Class Period, upon information and belief, Defendants had discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets.

70.     During the Class Period, all of the Defendants acted as fiduciaries of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

71.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan."   ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).   The Plan specifically names the Company as a "named fiduciary" for the purposes of the Plan.   *See* Plan Document § 10.2, NCC-ERISA 00105.   The Plan Document also lists the Committee, The Investment Manager and the Trustee as being "named fiduciaries."   *Id.*

72.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries,

i.e., performed fiduciary functions.  ERISA § 3(21)(A)(i) provides that a person is a fiduciary "to the extent … he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets … ."  During the Class Period, Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA.

**<u>Defendant National City</u>**

> 73.    National City is the Plan's Administrator and named fiduciary.

> 74.    Further, according to the Plan Documents:

> > National City Corporation (a Delaware corporation) a bank holding company located in Cleveland, Ohio.  The Company shall be the Plan Administrator and a Named Fiduciary hereunder.

*See* Plan Document § 1.1(11), NCC-ERISA 00013.

> 75.    The Company, serving as the Plan Administrator, as defined in ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A), was responsible for the administration of the Plan.

*See* Plan Document § 10.1, NCC-ERISA 00105.

> 76.    Plan fiduciaries, except for the Company, only had such powers, duties and responsibilities and authorities as specifically conferred upon him or it pursuant to provisions of the Plan or Trust Agreement, (*see* Plan Document § 10.1, NCC-ERISA 105) or such powers as they exercised notwithstanding the plan terms.

> 77.    Further:

> > … the Company may delegate to any person or persons any one or more of its powers, functions, duties and/or responsibilities with respect to the Plan or the Trust Fund.

*See* Plan Document § 10.3(1), NCC-ERISA 00105-00106.

78.     The Company had the exclusive authority and responsibility to appoint the Plan's Investment Manager.  *See* Plan Amendment No. 10 § 8.1(1), NCC-ERISA 00411

79.     The Board was responsible for appointing the members of the Administrative Committee.  The Board determines the number of members of the Administrative Committee and the manner for appointing and removing such members. *See* Plan Document § 10.6; NCC-ERISA 00107.

80.     The Company, through the Board, was responsible for appointing, evaluating and monitoring the Administrative Committee.  *Id.*

81.     Instead of delegating all fiduciary responsibility for the Plan to external service providers, National City chose to internalize this fiduciary function.  Thus, the Company exercised discretionary authority or control over the management and disposition of the Plan's assets, and was therefore a fiduciary under ERISA § 3(21)(A)(i), as well as a named fiduciary under ERISA § 402(a)(1).  National City at all times acted through its employees, including the Administration Committee Defendants who performed Plan-related fiduciary functions in the course and scope of their employment.

82.     First American had, at all applicable times, effective control over the activities of its officers and employees, including over their Plan-related activities. National City had the authority and discretion to hire and terminate said officers and employees.  In addition, the Company had the authority and discretion to hire and terminate said officers and employees.  In addition, the Company had the authority and discretion to appoint, monitor and remove individual officers and employees from their individual fiduciary roles with respect to the Plan.  Accordingly, the actions of the Administrative Committee, and/or any other employee fiduciaries are imputed to

National City under the doctrine of *respondeat superior*, and National City is liable for these actions.

## Administrative Committee

83.     Throughout the Class Period, the Administrative Committee was a Plan administrator, was a named fiduciary of the Plan, and had full discretionary authority to manage and control the operation and administration of the Plan.

84.     More specifically, the Plan Document conferred upon the Administrative Committee has the authority to "adopt rules for the administration of the Plan and rules for its government and the conduct of its business, including a rule authorizing one or more of its members or officers to execute instruments in its behalf evidencing its action. *See* Plan Document § 10.10, NCC-ERISA 00108.

85.     The Administrative Committee has the sole and absolute discretion to interpret the provision of the Plan.  *See* Plan Document § 10.11, NCC-ERISA 00109.

## Trustee

86.     Throughout the Class Period, the Trustee was a Plan administrator, was a named fiduciary of the Plan, and had full discretionary authority to manage and control the operation and administration of the Plan.

87.     More specifically, the Trustee was a named fiduciary of the Plan.  *See* Plan Document § 10.2, NCC-ERISA 00105.

88.     The Truest Agreement conferred upon the Trustee the following powers and duties:

(a)     The Trustee may sell, lease (with or without option to purchase), mortgage, transfer, exchange or otherwise dispose of all or any part of the property

constituting the Trust Fund and all property that may from time to time be substituted therefore or added thereto, at such prices and upon such terms and conditions and in such manner as it shall deem advisable, and any lease hereunder may for any term or terms irrespective of the period of the Trust.

(b)     The Trustee shall invest and reinvest the Trust Fund as it shall deem advisable in such notes, debentures, bonds, common and preferred stocks, trust certificates and other securities, including, but no limited to, stocks and other securities issued by any Controlled Group Member, but only to the extent permitted by section 407 of ERISA, loans, time and savings deposits (including deposits in the Trustee's own or its affiliates' banking departments if such deposits bear a reasonable interest rate), real estate, including, but not limited to, "qualifying employer real property" to the extent permitted by section 407 of ERISA, real estate mortgages, participating shares or interests in common trust or collective investment trust funds established or operated by the Trustee or others, shares in investment companies, annuity and insurance contracts (including, but not limited to, a contract or contracts with an insurance company or companies of the group annuity or deposit administration type), and other kinds of property, whether real or personal, as it may deem proper and suitable.  Exepct to the extent the Corporation otherwise directs, such property, together with all investments, reinvestments and proceeds thereof, shall be held as a common fund, without distinction as to principal or income or as to the source thereof.  The Trustee is expressly authorized and empowered to invest the assets of this Trust in the National City Corporation Investment Trust for Retirement Trusts and in the trust established by the <u>Declaration of Trust Establishing National City Bank Investment Fund for Retirement Trusts</u> or any

other collective investment trust fund of National City Bank or its affiliates so long as such collective investment trust fund and all trusts participating therein are exempt from federal income tax under section 501(a) of the Code; and the separate instruments creating any such collective investment trust funds, including amendments if any, are hereby adopted and made a part of each of the Plan and this Trust to the extent of the equitable share of this Trust in such collective investment trust fund. Assets placed in any such collective investment trust fund shall be held and administered by the trustee of such fund strictly in accordance with the terms and under the powers granted in such instrument. The commingling of assets of this Trust with assets of other qualified participating trusts in such collective investment trust fund is specifically authorized.

(c) Except as provided in Article IV with respect to shares of NCC Stock, the Trustee may (1) exercise any exchange privileges, conversion privileges and/or rights available in connection with any securities or other property at any time held by it; (2) consent to, or dissent from, the reorganization, consolidation, merger or readjustment of the finances of, or the sale, mortgage, pledge or lease of the property of, any corporation, company or organization any of the securities of which may at any time be held by it; (3) deposit any securities or other property held hereunder with any protective, reorganization or similar committee and delegate discretionary power thereto; and (4) do any act with reference to the matters in this Subsection, including, but not limited to, the exercise of options, making of agreements or subscriptions and the payment of expenses, assessments or subscriptions, which it may deem necessary or advisable in connections therewith.

(d)      The Trustee may retain for such time as it may deem advisable any securities or other property acquired by it pursuant to the preceding Subsection (c) of this Section 2.2, whether or not such securities or other property would normally be purchased as investments hereunder.

(e)      Except as provided in Article IV with respect to shares of NCC Stock, the Trustee may vote any stock or other securities and exercise any right appurtenant to any stock, proxy, power of attorney or other instrument.

(f)      The Trustee may, with the consent of the Corporation, borrow money with or without interest for the purposes of the Trust from others, including a Controlled Group Member or the Trustee's own banking department.  For the sums so borrowed, the Trustee may issue its promissory note as Trustee and may secure the repayment thereof by pledging any securities or other property held by it in the Trust Fund.

(g)      The Trustee may settle, compromise or submit to arbitration any claims, debts or damages due to or owing from the Trust, commence and defend suits or legal proceedings, and represent the Trust in all suites or legal proceedings.

(h)      The Trustee may manage, operate, repair, improve and collect the income from any real or personal property held by it in the Trust Fund.

(i)      The Trustee may (1) renew or extend or participate in the renewal or extension of any debt owing to the Trust or the Trustee, upon such terms as it may deem advisable, and agree to a reduction in the rate of interest on any such debt or to any other modification or change in the terms of any mortgage or of any guarantee pertaining thereto, in such manner and to such extent as it may deem advisable for the protection of

the Trust or the preservation of the value of the investment; (2) waive any default whether in the performance of any covenant or condition of any evidence of such indebtedness or mortgage or in the performance of any guarantee or enforce any rights available to the Trustee by reason of any such default in such manner and to such extent as it may deem advisable; (3) exercise and enforce any and all rights of foreclosure, bid on property in foreclosure, take a deed in lieu of foreclosure, with or without paying consideration therefor (sic), and in  connection therewith release the obligation on any note or other evidence of indebtedness secured by such mortgage; and (4) exercise and enforce in any action, suit or proceeding at law or in equity any rights or remedies in respect to any such debt, mortgage or guarantee.

(j)     The Trustee may hold uninvested, without liability for interest thereon, except such as may be allowed in accordance with its regulations, such part of the Trust Fund as it shall deem necessary or advisable.

(k)     The Trustee may hold securities in bulk or bearer form, may deposit them with any depository, and may hold securities or other property held by it hereunder in its own name or in the name of a nominee without the addition of words indicating that such property is held in a fiduciary capacity, but it shall be liable for any loss which may result from any property being so held hereunder instead of in its name as Trustee.

(l)     The Trustee shall be liable for the safekeeping of all personal property constituting a part of the Trust Fund.

(m)     The Trustee may make, execute and deliver, as Trustee, with or without a provision for no individual liability on its part, any and all conveyances, notes,

mortgages, contracts, waivers, releases, leases, assignments, powers of attorney or other instruments in writing that the Trustee may deem necessary or advisable in administering the Trust.

(n)     The Trustee may employ suitable agents (including, but not limited to investment advisors) and counsel (who may be counsel for a Controlled Group Member) and may pay their reasonable compensation and expenses, without (except as otherwise provided by ERISA) any liability for any loss occasioned by any such agents selected by the Trustee with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

(o)     The Trustee shall make payments, distributions, transfers and deliveries from the Trust Fund as provided in Section 2.3(b) hereof and, subject to the provisions of Section 2.1 hereof, shall accept payments and contributions into the Trust Fund in accordance with the provisions of the Plan.

(p)     The Trustee may engage in the lending of securities to banks and broker-dealers approved by the Trustee, pursuant to regulations of the Department of Labor and any other applicable regulatory authority and in accordance with a written agreement entered into with the Corporation.

(q)     With the consent of the corporation, the Trustee may appoint trustees or custodians to hold title to property of the Trust in those jurisdictions in which the Trustee is not authorized to do business and, subject to the provisions of this Agreement, to define the scope of the responsibilities of each such trustee and custodian.

(r)     Except as other wise provided in this Trust Agreement or as provided by applicable law, the Trustee may do all such acts, execute all such instruments, engage in all such proceedings and exercise all such rights, powers and privileges with respect to any assets constituting a part of the Trust Fund as it may deem necessary or advisable to carry out the purposes of this Trust Agreement.

*See* Trust Agreement at 3-7, NCC ERISA 00458-462.

89.     On March 31, 2008, National City issued a letter to Participants in the Plan revealing that the Company had engaged U.S. Trust, Bank of America, Private Wealth Management ("U.S. Trust"), to be named the fiduciary of the Plan's National Stock Fund (the "March 2008 Plan Letter").  According to the March 2008 Plan Letter, it would be U.S. Trust's sole decision as to whether the Plan would continue to invest in the National Stock Fund.  Indeed, the letter revealed that U.S. Trust could even completely divest the Plan of National Stock Fund. A true and correct copy of the March 28, 2008 Plan Letter is attached hereto and incorporated herein as Exhibit "F."

**Fiduciary Duties Under ERISA**

90.     ERISA mandates that pension plan fiduciaries have a duty of loyalty to the plan and its participants which includes the duty to speak truthfully to the Plan and its participants when communicating with them.  A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and Beneficiaries.  "[L]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA." *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996).

91.     Moreover, an ERISA fiduciary's duty of loyalty requires the fiduciary to correct the inaccurate or misleading information so that plan participants will not be injured.  *See, e.g., Griggs v. E.I. Dupont de Nemours & Co.*, 237 F.3d 371, 381 (4th Cir. 2001) ("[An] ERISA fiduciary that knows or should have known that a beneficiary labors under a material misunderstanding of plan benefits that will inure to his detriment cannot remain silent – especially when that misunderstanding was fostered by fiduciary's own material representations or omissions."); *Matthews v. Chevron Corp.*, 362 F.3d 1172, 1180 (9th Cir. 2004); *Bixler v. Central Penn. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3rd Cir. 1993); *In re JDS Uniphase Corp. ERISA Litigation*, 2005 WL 1662131 (N.D. Cal. 2005).

92.     A plan fiduciary also "has an affirmative duty to inform beneficiaries of circumstances that [as alleged herein] threaten the funding of benefits." *Acosta v. Pacific Enter.*, 950 F.2d 611, 619 (9th Cir. 1991).

93.     Defendants made direct and indirect communications with the Plan's participants including statements regarding investments in Company stock.   These communications included, but were not limited to, SEC filings, annual reports, press releases, and Plan documents (including Summary Plan Descriptions ("SPDs") and/or prospectuses regarding Plan/participant holdings of Company stock), which included and/or reiterated these statements.  Upon information and belief, at all times during the Class Period, National City's SEC filings were incorporated into and part of the SPDs, and/or a prospectus and/or any applicable SEC Form S-8 registration statements. Defendants also acted as fiduciaries to the extent of this activity.

94.    Further, Defendants, as the Plan's fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plan's participants, well-recognized in the 401(k) literature and the trade press,[6] concerning investment in company stock, including that:

(a)    Employees tend to interpret a match in company stock as an endorsement of the company and its stock;

(b)    Out of loyalty, employees tend to invest in company stock;

(c)    Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

(d)    Employees tend not to change their investment option allocations in the plan once made;

(e)    No qualified retirement professional would advise rank and file employees to invest more than a modest amount of retirement savings in company stock, and many retirement professionals would advise employees to avoid investment in company stock entirely;

(f)    Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

---

[6] *See, e.g.*, Joanne Sammer, *Managed Accounts: A new direction for 401(k) plans*, Journal of Accountancy, Vol. 204, No. 2 (August 2007) (available at: http://www.aicpa.org/pubs/jofa/aug2007/sammer.htm); Roland Jones, *How Americans Mess Up Their 401(k)s*, MSNBC.com (June 20, 2006) (available at: http://www.msnbc.msn.com/id/12976549/); Bridgitte C. Mandrian and Dennis F. Shea, *The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior*, 116 Q. J. Econ. 4, 1149 (2001) (available at: http://mitpress.mit.edu/journals/pdf/qjec_116_04_1149_0.pdf); Nellie Liang & Scott Weisbenner, 2002, *Investor behavior and the purchase of company stock in 401(k) plan - the importance of plan design*, Finance and Economics Discussion Series 2002-36, Board of Governors of the Federal Reserve System (U.S.) (available at:  http://www.federalreserve.gov/pubs/feds/2002/200236/200236pap.pdf).

      (g)     Even for risk-tolerant investors, the risks inherent to company stock are not commensurate with it rewards.

95.     Even though Defendants knew or should have known these facts, and even though Defendants knew of the significant investment of the Plan's funds in Company stock, they still disseminated inaccurate, incomplete and materially misleading statements Plan-wide regarding the Company's financial and operational health and future prospects, and/or did nothing to correct such statements.

## DEFENDANTS' CONDUCT

### Background and Summary

96.     National City is a financial holding company.  The Company operates through an extensive branch bank network in multiple states and also conducts selected lending businesses and provides other financial services on a nationwide basis.  National City's primary businesses include commercial and retail banking, mortgage financing and servicing, consumer finance, and asset management.

97.     For a substantial period of time, National City had a reputation for being a conservative bank that engaged in relatively low-risk, traditional banking.

98.     However, in September 1999, National City deviated from this trend and purchased First Franklin, a large subprime mortgage loan originator.  The Company transitioned from commercial lending to making residential loans to risky borrowers.

99.     Accordingly, National City became heavily entwined in the subprime mortgage loan industry and developed a multi-billion dollar portfolio of subprime mortgage loans.

100.    Many subprime mortgage loans were made to risky borrowers; and on terms on which many borrowers could not afford.

101.    By the end of 2006, a perfect storm was brewing.  Billions of dollars in risky subprime mortgage loans had been made to borrowers who could barely afford to pay their monthly mortgage notes.  At the same time, housing prices were falling and interest rates were rising.

102.    Further, in 2006 many subprime mortgages began to reset from low teaser interest rates to substantially higher variable rates.  The confluence of the resetting of subprime mortgages to higher rates, falling housing prices and the rise in interest rates effectively left many of National City's customers living in homes they clearly could not afford which, in turn, led to foreclosures and predictably large loan losses for the Company.

103.    In December 2006, National City sold First Franklin and purportedly turned its attention back to more traditional lending but, as described herein, the sale of First Franklin did little to prevent or lessen National City's exposure to subprime losses.

104.    National City's strategy also included a rapid and massive expansion into the Florida market, where it spent approximately $2 billion to build its presence and also increase its mortgage lending business in Florida.

105.    After the sale of First Franklin, National City also implemented a massive stock buyback plan.

106.    As has been well documented, throughout 2007, the subprime mortgage industry experienced an unprecedented collapse, delivering a mighty blow to those who had gambled heavily upon this unstable market.

107.    As the problems in the mortgage market ballooned, National City became more and more exposed to substantial losses.

108.    Throughout 2007, despite the crisis in the mortgage loan and housing industries, National City gave little, if any, indication of the true extent to which it would be affected.

109.    However, National City actually did have substantial exposure to mortgage-related losses.  First, when National City sold First Franklin, it retained over $10 billion in subprime mortgage loans in its portfolio.  Second, National City's rapid and eager expansion into Florida left it overexposed to potential losses, as the mortgage loan default and foreclosure rates drastically increased.  Third, National City's business practices, including its large stock repurchase program had left it with too little reserves for loan losses.

**National City Purportedly Rids Itself of its Subprime Mortgage Loan Business and Expands its Traditional Business Model**

110.    On September 5, 2006, the first day of the Class Period, National City announced that it would sell First Franklin to Merrill Lynch.  The Company stated that the disposition of First Franklin was "a clear win for all parties" and would enable the Company to turn focus away from subprime mortgages and toward its traditional banking business model.

111.    Also on September 5, 2006, despite the pending sale of First Franklin to Merrill Lynch, National City announced that it expected to keep approximately $10 billion of First Franklin-originated subprime mortgage loans in its portfolio.  However, the Company downplayed the significance of the First Franklin loans that it would retain and indicated that, despite the existence of challenging conditions in the mortgage

business, the First Franklin-originated loans were "seeing reasonably good volume and gain-on-sale performance."

112.    National City also decided to expand its presence in Florida, a large player in the housing market.  On December 1, 2006, National City acquired Harbor Florida Bancshares Inc. ("Harbor Florida"), the holding company for Harbor Federal Savings Bank, a Florida-based bank, and, shortly thereafter, acquired Fidelity Bancshares Inc. ("Fidelity Bancshares"), another Florida-based bank, for a combined amount of approximately $2 billion.

113.    Also in December 2006, National City announced that the Board had authorized the repurchase of up to 40 million shares of outstanding common stock.

114.    On January 2, 2007, National City announced that it had completed the sale of First Franklin to Merrill Lynch, effective December 30, 2006.

115.    On January 23, 2007, when National City released a statement disclosing its financial results for Fourth Quarter 2007, it also reported a $172 million charge, resulting from losses from First Franklin subprime mortgage loans that National City had retained.  However, the Company also boasted that its fourth quarter earnings had doubled after its sale of First Franklin and its expansion in to the Florida market.

116.    Also on January 23, 2007, National City indicated that it would rid itself of some of the First Franklin subprime mortgage loans it had retained, by selling them. Further, the Company acknowledged the problems within the subprime market, but stated, "**We see no sign for alarm**."  Elizabeth Hester, National City Profit Rises on Sale of First Franklin, Bloomberg (January 23, 2007) (quoting National City President Peter Raskind) (emphasis added).

117. On this news, shares of National City stock rose approximately 2.8%, to $36.47.

118. On January 25, 2007, National City announced that the Board had approved the initiation of a tender offer, extending from January 26, 2007 through the end of February 2007, to repurchase up to 75,000,000 shares of its outstanding common stock at a price of at least $35/share and as high as $38.50/share.

**Regulators' Pre-Class Period Subprime Guidance**

119. Prior to the Class Period banking regulators issued guidelines to alert lenders (including such as National City) to the risks associated with subprime lending and the need for careful administration of any subprime loans. The Interagency Guidance on Subprime Lending, dated March 1, 1999 (the "1999 Subprime Guidance"), and issued jointly by the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of the Comptroller of the Currency, and the Office of Thrift Supervision (collectively the "Interagency" or "Interagencies"), defined "subprime lending" as:

> [E]xtending credit to borrowers who exhibit characteristics indicating a significantly higher risk of default than traditional bank lending customers. Risk of default may be measured by traditional credit risk measures (credit/repayment history, debt to income levels, etc.) or by alternative measures such as credit scores. Subprime borrowers represent a broad spectrum of debtors ranging from those who have exhibited repayment problems due to an adverse event, such as job loss or medical emergency, to those who persistently mismanage their finances and debt obligations. Subprime lending does not include loans to borrowers who have had minor, temporary credit difficulties but are now current. This guidance applies to direct extensions of credit; the purchase of subprime loans from other lenders, including delinquent or credit impaired loans purchased at a discount; the purchase of subprime

> automobile or other financing "paper" from lenders or
> dealers; and the purchase of loan companies that originate
> subprime loans.

1999 Subprime Guidance (footnote omitted).

120. The 1999 Subprime Guidance also stated, in part:

> Institutions should recognize the additional risks inherent in
> subprime lending and determine if these risks are
> acceptable and controllable given the institution's staff,
> financial condition, size, and level of capital support.
> Institutions that engage in subprime lending in any
> significant way should have board-approved policies and
> procedures, as well as internal controls that identify,
> measure, monitor, and control these additional risks.
> Institutions that engage in a small volume of subprime
> lending should have systems in place commensurate with
> their level of risk. Institutions that began a subprime
> lending program prior to the issuance of this guidance
> should carefully consider whether their program meets the
> following guidelines and should implement corrective
> measures for any area that falls short of these minimum
> standards. If the risks associated with this activity are not
> properly controlled, the agencies consider subprime lending
> a high-risk activity that is unsafe and unsound.

> **Capitalization**

> The federal banking agencies believe that subprime lending
> activities can present a greater than normal risk for
> financial institutions and the deposit insurance funds;
> therefore, the level of capital institutions need to support
> this activity should be commensurate with the additional
> risks incurred. The amount of additional capital necessary
> will vary according to the volume and type of subprime
> activities pursued and the adequacy of the institution's risk
> management program. Institutions should determine how
> much additional capital they need to offset the additional
> risk taken in their subprime lending activities and document
> the methodology used to determine this amount. The
> agencies will evaluate an institution's overall capital
> adequacy on a case-by-case basis through on-site
> examinations and off-site monitoring procedures
> considering, among other factors, the institution's own
> analysis of the capital needed to support subprime lending.

Institutions determined to have insufficient capital must correct the deficiency within a reasonable timeframe or be subject to supervisory action. In light of the higher risks associated with this type of lending, the agencies may impose higher minimum capital requirements on institutions engaging in subprime lending.

**Risk Management**

The following items are essential components of a well-structured risk management program for subprime lenders:

**Planning and Strategy**. Prior to engaging in subprime lending, the board and management should ensure that proposed activities are consistent with the institution's overall business strategy and risk tolerances, and that all involved parties have properly acknowledged and addressed critical business risk issues. These issues include the costs associated with attracting and retaining qualified personnel, investments in the technology necessary to manage a more complex portfolio, a clear solicitation and origination strategy that allows for after-the-fact assessment of underwriting performance, and the establishment of appropriate feedback and control systems. The risk assessment process should extend beyond credit risk and appropriately incorporate operating, compliance, and legal risks. Finally, the planning process should set clear objectives for performance, including the identification and segmentation of target markets and/or customers, and performance expectations and benchmarks for each segment and the portfolio as a whole. Institutions establishing a subprime lending program should proceed slowly and cautiously into this activity to minimize the impact of unforeseen personnel, technology, or internal control problems and to determine if favorable initial profitability estimates are realistic and sustainable.

**Staff Expertise**. Subprime lending requires specialized knowledge and skills that many financial institutions may not possess. Marketing, account origination, and collections strategies and techniques often differ from those employed for prime credit; thus it may not be sufficient to have the same lending staff responsible for both subprime loans and other loans. Additionally, servicing and collecting subprime loans can be very labor intensive. If necessary, the institution should implement programs to train staff. The

board should ensure that staff possesses sufficient expertise to appropriately manage the risks in subprime lending and that staffing levels are adequate for the planned volume of subprime activity. Seasoning of staff and loans should be taken into account as performance is assessed over time.

**Lending Policy**. A subprime lending policy should be appropriate to the size and complexity of the institution's operations and should clearly state the goals of the subprime lending program. While not exhaustive, the following lending standards should be addressed in any subprime lending policy:

- Types of products offered as well as those that are not authorized;
- Portfolio targets and limits for each credit grade or class;
- Lending and investment authority clearly stated for individual officers, supervisors, and loan committees;
- A framework for pricing decisions and profitability analysis that considers all costs associated with the loan, including origination costs, administrative/servicing costs, expected charge-offs, and capital;
- Collateral evaluation and appraisal standards;
- Well defined and specific underwriting parameters (i.e., acceptable loan term, debt to income ratios, loan to collateral value ratios for each credit grade, and minimum acceptable credit score) that are consistent with any applicable supervisory guidelines;
- Procedures for separate tracking and monitoring of loans approved as exceptions to stated policy guidelines;
- Credit File documentation requirements such as applications, offering sheets, loan and collateral documents, financial statements, credit reports, and credit memoranda to support the loan decision; and
- Correspondent/broker/dealer approval process, including measures to ensure that loans originated through this process meet the institution's lending standards.

If the institution elects to use credit scoring (including applications scoring) for approvals or pricing, the scoring

model should be based on a development population that captures the behavioral and credit characteristics of the subprime population targeted for the products offered. Because of the significant variance in characteristics between the subprime and prime populations, institutions should not rely on models developed solely for products offered to prime borrowers. Further, the model should be reviewed frequently and updated as necessary to ensure that assumptions remain valid.

*        *        *

**Loan Administration Procedures**. After the loan is made or purchased, loan administration procedures should provide for the diligent monitoring of loan performance and establish sound collection efforts. To minimize loan losses, successful subprime lenders have historically employed stronger collection efforts such as calling delinquent borrowers frequently, investing in technology (e.g., using automatic dialing for follow-up telephone calls on delinquent accounts), assigning more experienced collection personnel to seriously delinquent accounts, moving quickly to foreclose or repossess collateral, and allowing few loan extensions. This aspect of subprime lending is very labor intensive but critical to the program's success. To a large extent, the cost of such efforts can represent a tradeoff relative to future loss expectations when an institution analyzes the profitability of subprime lending and assesses its appetite to expand or continue this line of business.

Subprime loan administration procedures should be in writing and at a minimum should detail:

- Billing and statement procedures;
- Collection procedures;
- Content, format, and frequency of management reports;
- Asset classification criteria;
- Methodology to evaluate the adequacy of the allowance for loan and lease losses (ALLL);
- Criteria for allowing loan extensions, deferrals, and re-agings;
- Foreclosure and repossession policies and procedures; and
- Loss recognition policies and procedures.

**Loan Review and Monitoring**. Once loans are booked, institutions must perform an ongoing analysis of subprime loans, not only on an aggregate basis but also for sub-portfolios. Institutions should have information systems in place to segment and stratify their portfolio (e.g., by originator, loan-to-value, debt-to-income ratios, credit scores) and produce reports for management to evaluate the performance of subprime loans. The review process should focus on whether performance meets expectations. Institutions then need to consider the source and characteristics of loans that do not meet expectations and make changes in their underwriting policies and loan administration procedures to restore performance to acceptable levels.

When evaluating actual performance against expectations, it is particularly important that management review credit scoring, pricing, and ALL adequacy models. Models driven by the volume and severity of historical losses experienced during an economic expansion may have little relevance in an economic slowdown, particularly in the subprime market. Management should ensure that models used to estimate credit losses or to set pricing allow for fluctuations in the economic cycle and are adjusted to account for other unexpected events.

**Consumer Protection**. Institutions that originate or purchase subprime loans must take special care to avoid violating fair lending and consumer protection laws and regulations. Higher fees and interest rates combined with compensation incentives can foster predatory pricing or discriminatory "steering" of borrowers to subprime products for reasons other than the borrower's underlying creditworthiness. An adequate compliance management program must identify, monitor and control the consumer protection hazards associated with subprime lending.

Subprime mortgage lending may trigger the special protections of "The Home Ownership and Equity Protection Act of 1994," Subtitle B of Title I of the Riegle Community Development and Regulatory Improvement Act of 1994. This Act amended the Truth-in-Lending Act to provide certain consumer protections in transactions involving a class of non-purchase, closed-end home mortgage loans. Institutions engaging in this type of lending must also be thoroughly familiar with the

obligations set forth in Regulation Z, 12 C.F.R. §226.32, and Regulation X, the Real Estate Settlement Procedures Act (RESPA), 12 USC §2601, and adopt policies and implement practices that ensure compliance.

The Equal Credit Opportunity Act makes it unlawful for a creditor to discriminate against an applicant on a prohibited basis regarding any aspect of a credit transaction. Similarly, the Fair Housing Act prohibits discrimination in connection with residential real estate-related transactions. Loan officers and brokers must treat all similarly situated applicants equally and without regard to any prohibited basis characteristic (e.g., race, sex, age, etc.). This is especially important with respect to how loan officers or brokers assist customers in preparing their applications or otherwise help them to qualify for loan approval.

*    *    *

**Reevaluation**. Institutions should periodically evaluate whether the subprime lending program has met profitability, risk, and performance goals. Whenever the program falls short of original objectives, an analysis should be performed to determine the cause and the program should be modified appropriately. If the program falls far short of the institution's expectations, management should consider terminating it. Questions that management and the board need to ask may include:

- Have cost and profit projections been met?
- Have projected loss estimates been accurate?
- Has the institution been called upon to provide support to enhance the quality and performance of loan pools it has securitized?
- Were the risks inherent in subprime lending properly identified, measured, monitored and controlled?
- Has the program met the credit needs of the community that it was designed to address?

*Id.*

121.    Thus, prior to the Class Period, banking regulators had not outlawed subprime lending entirely, but had pointed out to potential lenders the need for very careful administration of any subprime lending activities.  The regulators' guidance on

this important subject continued in 2001.  On January 31, 2001, the Interagencies issued a Joint Release entitled "Banking Agencies Issue Guidance on Supervision of Subprime Lending" (the "2001 Subprime Supervision Guidance").   The 2001 Subprime Supervision Guidance stated that "[f]or purposes of this guidance, 'subprime lending' refers to programs that target borrowers with weakened credit histories typically characterized by payment delinquencies, previous charge-offs, judgments, or bankruptcies. Such programs may also target borrowers with questionable repayment capacity evidenced by low credit scores or high debt-burden ratios."  The 2001 Suprime Guidance also advised that "institutions are expected to recognize both the elevated risk levels posed by participation in subprime lending programs and the enhanced risk management standards needed to successfully engage in this activity."  *Id*.   The Interagencies specifically stated that they had concerns regarding subprime lenders' "Allowance for Loan and Lease Losses (ALLL), regulatory capital, examination review of subprime activities, classification of risk, and documentation for re-aging, renewing, or extending delinquent accounts."  *Id*.   Accordingly, the Interagencies reinforced the continued importance of the 1999 Subprime Guidance.

122.   The Interagencies reinforced the applicability of the 1999 Subprime Guidance and 2001 Subprime Supervision Guidance during the Class Period.  On July 25, 2007, the OCC issued its Bulletin 2007-26, announcing the Interagencies and National Credit Union Administration's Statement on Subprime Lending.  According to the Bulletin, the "statement complements the agencies' existing guidance on subprime lending programs (OCC Bulletins 1999-10 and 2001-6) and the 1993 *Interagency Guidelines for Real Estate Lending*."  The Bulletin also stated that the "agencies are also

concerned that borrowers may not be adequately informed of the product features, material loan terms, and product risks. The statement underscores that communications with consumers should provide clear and balanced information about the relative benefits and risks of these products."

**National City's Subprime Lending**

123.    The Regulators' advice to wade carefully into any subprime lending activities would not heeded by National City.  Indeed, National City, through its affiliate, FFFC now has the dubious distinction of specializing in a mortgage product that has been castigated by, among others, the Joint Economic Committee of the U.S. Senate in its hearing, "Evolution of an Economic Crisis?:  The Subprime Lending Disaster and the Threat to the Broader Economy"  which was held on September 19, 2007, a date on which National City had yet to come clean on its pervasive loss exposure.  Not only did FFFC specialize in extremely risky subprime products, but its parent, National City, decided to keep a large percentage of its ill-fated affiliate's toxic "home cooked" mortgage products in their own portfolio, rather than selling them downstream to institutional investors, like so many other profligate subprime lenders.  Indeed, US Senator Charles E. Schumer, in his opening statement to Committee Members indicated that the Joint Economic Committee had ". . . .been concerned for months about the dangers to the American economy as a result of widespread, unscrupulous subprime lending and the economic news in the last six months has disappointingly confirmed those fears."

124.    As noted, National City made its major foray into the subprime arena with its acquisition of First Franklin on August 31, 1999 for $266 million.[7]   This acquisition instantly made National City a major player subprime mortgage lending:

> In 1999 National also acquired First Franklin Financial Companies, a leading wholesale originator of nonconforming home mortgages. This acquisition, combined with Altegra, the existing nonconforming mortgage lender, places National in the top 10 nationally in this type of financing.[8]

125.    While most of the major originators of subprime loans were in the business of packaging loans into securitizations and selling them downstream to investors, beginning in 2000 National City began to hold a large portion of its First Franklin loans in its portfolio.  According to a description of First Franklin in National City's 2000 fiscal year end Form 10-K:

> Acquired in the second half of 1999, First Franklin Financial Companies, Inc. originates "nonconforming" mortgages through a broker network. The loans are then sold to financial institutions and other buyers. The loans are typically in the higher credit tier of nonprime mortgages. **Beginning in 2000, National began to hold a portion of the First Franklin products in the portfolio.** In the near term, holding these loans softens earnings because of reduced gain on sale, but over time, the value of holding the loans should greatly exceed the foregone gain.[9] [Emphasis added]

126.    Later in the same filing, National City characterized the portion of FFFC-originated loans it would hold in its portfolio as "substantial": "…due to the Corporation's decision in 2000 to **retain a substantial portion** of First Franklin's loan

---

[7] National Third Quarter 1999 Form 10-Q, filed with the SEC on November 1, 1999

[8] National FYE 1999 Form 10-K, filed with the SEC on January 26, 2000

[9] National FYE 2000 Form 10-K, filed with the SEC on January 26, 2001

production."[10] [Emphasis added]   National City's then-CEO, David Daberko, explained that the shift away from thinner-spread assets was to "…make room on the balance sheet for higher-return assets, such as the nonconforming mortgage loans generated by our First Franklin subsidiary."[11]   According to Mr. Daberko, "These loans are readily saleable to third parties at a premium to origination cost but have greater lifetime value when held on the balance sheet."   The following chart represents First Franklin's total originations, the amount retained by National City, the percentage of retention, and National City's "First Franklin residential real estate portfolio," when disclosed from 2000 through 2005.[12]

|  | Fiscal Year End | | | | | |
|---|---|---|---|---|---|---|
|  | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
| Total FFFC Originations | N/D | $6.3B | $10.7B | $20.1B | $29.2B | $29.6B |
| FFFC Retained | $2.7B | $3.8B | $5.5B | $10.20 | $9.6B | $8.2B |
| Percentage Retained | N/D | 60.32% | 51.40% | 50.75% | 32.88% | 27.70% |
| Total FFFC Portfolio | N/D | N/D | N/D | $15.1B | $18.3B | $18.7B |
| N/D = Not Disclosed | | | | | | |

127.   As illustrated by the above chart, National City retained more than 50% of First Franklin's loan originations from 2001 through 2003.

128.   As one of the first and largest subprime originators, First Franklin introduced many of the "affordability products" (or "nontraditional products") that have caused so many of the current problems in the credit markets. These extremely risky

---

[10] National FYE 2000 Form 10-K, filed with the SEC on January 26, 2001

[11] National FYE 2000 Form 10-K, filed with the SEC on January 26, 2001

[12] Taken from National FYE 2001-2005 Forms 10-K, respectively

"affordability products" also found their way directly into National City's portfolio both prior to and during the Class Period.

129.    In the summer of 2007, National City's stock began to decline as investors became aware of the large amount of subprime mortgage loans on National City's balance sheet, as well as on the books of other banks. Defendants, however, assured the Participants and the market that the Company was well positioned, with a lower risk portfolio. Defendants also assured the market that they saw no reason the dividend would need to be reduced. As a result, National City's stock continued to trade at artificially inflated levels.

130.    Defendants knew or should have known that its retention of billions of dollars in First Franklin-originated subprime mortgage loans subjected it to tremendous exposure to losses related to the ongoing crisis in the subprime mortgage market. Further, Defendants were also in a superior position, as compared to Plaintiffs and Class, to know the truth about the impact of the subprime mortgage and housing market problems upon the Company's condition.  Accordingly, Defendants knew or should have known that the Company's stock would, as it did, continuously erode and cause Plan participants to suffer millions of dollars in reduced retirement savings.  Yet, Defendants did absolutely nothing to protect the Plan's assets or participants, despite the Plan's heavy investment in Company stock.

131.    Defendants took no steps to protect Plan participants from impending losses, as the mortgage and housing markets slumped.  Meanwhile, separately, both the Mortgage Bankers Association and the National Association of Realtors issued

projections, predicting that mortgage originations and home sales were expected to drop significantly.

132.    In its most recent Form 10-K, filed for fiscal year end 2007, National City disclosed:

> **Nonprime mortgage loans, which include both first and second lien mortgages, were originated by the Corporation's former First Franklin unit which was sold in late 2006**. Nonprime mortgage loans were generally not readily salable in the secondary market to the GSEs for inclusion in mortgage-backed securities due to the **credit characteristics of the borrower, the underlying documentation, the loan-to-value ratio, or the size of the loan, among other factors**. However, prior to 2007, these loans were generally salable to other third-party investors. **Nonprime mortgage loans included interest-only loans and loans with various borrower documentation levels**. The Corporation has never offered mortgages with negative amortization. [Emphasis added]

133.    Further, National City disclosed:

> As of December 31, 2007, interest-only and second-lien loans comprised 21% and 25% of the portfolio, respectively. The average FICO scores associated with first-lien and second-lien loans were 616 and 637, respectively, at December 31, 2007.

134.    National City's losses related to subprime (also called "non prime") lending did not stem – unlike other well-publicized instances of subprime losses at large banks – from the purchase of complex debt securities collateralized by packages of subprime mortgages, which were originated by lenders with horribly low underwriting standards.   Instead, the First Franklin loans had been originated by a subsidiary of National City itself.   As a result, National City was fully aware of, and was ultimately responsible for, the underwriting standards and risky loan products used by First Franklin, including details relevant to credit risk (e.g., loan-to-value information,

47

borrower income levels and the debt-to-income levels, geographic location, interest-only products, subordinate second lien position, etc.).

135.    National City thus cannot claim surprise regarding the amount of losses being experienced on its exposure to "nonprime mortgages", which totaled $6 billion as of December 31, 2007 ($5.3 billion as of March 31, 2008).

136.    In any event, National City's subprime lending practices did not constitute all of National City's problematic lending practices during the Class Period.  Ultimately, in February of 2008, National City would admit to additional significant problems relating to its Construction Loans and Home Equity Loans.  In particular, on February 13, 2008, when National City filed its 2007 fiscal year end Form 10-K with the SEC, it made the following unexpected admissions:

> **Management considers certain segments of the loan portfolio to pose a higher risk of credit loss**. These portfolios consist of construction loans to residential real estate developers and consumers, nonprime mortgage loans, and broker-sourced home equity loans and lines of credit. **These borrowers have been adversely affected by the decline in the housing markets**. [Emphasis added]

137.    According to National City's disclosure, these "higher risk" assets totaled nearly $25 billion.  Based on these numbers, an astounding 22% of National City's total $116 billion loan portfolio was termed "high risk."  Yet, this was the first disclosure of the existence of such "high risk" assets in National's SEC filings.  National City's 2007 fiscal year end Form 10-K stated:

| (In Millions) | 2007 | 2006 |
|---|---|---|
| **Commercial construction:** | | |
| Residential real estate developers | $  4,491 | $  3,915 |
| **Residential real estate:** | | |
| Nonprime mortgage | 6,012 | 7,480 |
| Broker-sourced home equity loans | 3,732 | 1,412 |
| Residential construction | 3,062 | 2,564 |
| **Home equity lines of credit:** | | |
| Broker-sourced home equity lines | 7,475 | 5,928 |
| **Total higher risk loan portfolios** | $ 24,772 | $ 21,299 |

Based on the above, it is clear that approximately $21.3 billion (22% of National's total $95.5 billion portfolio) in exposure to these same admitted high-risk assets existed at the end of 2006 (*of which only $6.0 billion, or 25%, related to subprime*), yet they were not disclosed to the Participants as high risk until at least February 2008. Accordingly, the Plan Beneficiaries had no warning regarding the massive losses that would plague National during the Class Period. Such losses would result in a precipitous decline in the value of Plan assets.

138. Based on National City's belated disclosures, the high-risk portfolio assets were consolidated into three main categories: (1) Construction Loans to residential real estate developers ($4.5 billion) and consumers ($3.1 billion); (2) Nonprime Mortgage Loans ($6 billion (previously discussed); (3) and Home Equity Products, including broker-sourced home equity loans ($3.7 billion) and lines of credit ($7.5 billion).[13]

**National City's Construction Loans**

139. Through its National Mortgage (NCM) division, National City originated approximately $3.1 billion in construction loans to finance the construction of residential real estate, which were held in the Company's loan portfolio (the "Residential

---

[13] In its Form 10-Q for the first quarter of 2008, filed with the SEC on May 12, 2008, National provided the same disclosure of high-risk assets, totaling approximately $22.9 billion as of March 31, 2008 including: (1) construction loans to residential real estate developers ($4.1 billion) and consumers ($2.7 billion); (2) nonprime mortgage loans ($5.3 billion); (3) and Home Equity Products, including broker-sourced home equity loans ($3.5 billion) and lines of credit ($7.2 billion).

Construction Loans").[14]   National City's self-described "unique approach" to construction lending allowed National City to become the second largest provider of residential construction loans in the country. However, that same approach saddled National City with "an expectation of $550 million to $625 million" of imminent Construction Loan losses.[15]   In fact, on a dollar for dollar basis, as Defendants would later admit, the Company's Residential Construction Loans would generate *greater losses than the Company's subprime loans*.

140.   In fact, Defendants later admitted that they had realized, it appears by "late 2006",[16] that the subprime origination standards of the Residential Construction Loans constituted a serious "product deficiency", and that the Residential Construction Loans' "bad product design" had exposed those loans to high likelihood of default and extreme loss severity upon default. However, it wasn't until September 6, 2007 that National City finally disclosed this information to the public via a conference call:

> ROWE: ...**Clearly in my mind, it was a <u>product deficiency</u>, underwriting deficiency on the investor construction book at NCM, at National Mortgage Company**. It is part of our legacy that **when we're doing deals on the corporate side or on the consumer side, there is money going in. That was supposed to be the case here. It did not come in at the point in time when the first money went out to buy the land**. It was supposed to come in at vertical. Quite frankly, it just was not -- we

---

[14] These Construction Loans were not separately identified and listed as a separate line item until National's 2007 fiscal year end Form 10-K was filed with the SEC on February 13, 2008. Previous to that date, National conveniently subsumed the Construction Loans within much larger (and better-performing) loan portfolios.

[15] Q1 2008 National Earnings Conference Call, April 21, 2008

[16] According to National's 2007 FYE Form 10-K, filed with the SEC on February 13, 2008, "**Management tightened underwriting standards for residential construction loans beginning in late 2006** which is expected to significantly reduce production volume in 2008." [Emphasis]  Based on this disclosure, it appears that National had identified the underwriting and product design flaws in the Construction loans in "late 2006."

just did not think about that. We did not think you are going to have significant property price depreciation that would cause people to just walk.

UNIDENTIFIED COMPANY REPRESENTATIVE: I would just make a quick add... **As Rob said, <u>bad product design</u>**. Because the product was originated for sale, it was always structured so to go to a permanent, there was a buyer for the permanent loan. But **unlike the products that go through our normal credit process, there wasn't an injection of equity up front**. The injection of equity occurred when the construction went vertical on the property. **That was not a good structure**. We are incorporating the costs of working through that right now. [Emphasis added]

141. National City's Construction Loan problems arose from the fact that National City offered Residential Construction Loans on a "no money down" basis. Basically, National City would advance the full amount of the funds necessary to acquire the land as well as the full amount of funds needed to pay for construction of the residence, if necessary, up front (i.e. 100% "LTV" or Loan to Value) without requiring any equity from the borrower (i.e. "no money down"). Sharp property price declines during 2006, especially in key construction loan markets such as Florida and California, removed the economic incentive for construction loan borrowers to continue with construction, because they would be left owing more on their mortgages than their property would be worth when construction was finished. Because the borrowers did not have any of their own money at risk as a result of this 100% LTV, "no money down" structure, there was nothing stopping them from walking away to avoid the impending loss that would likely befall them upon the completion of construction. They were, in fact, *incentivized* to do abandon the loan. By defaulting on the loan, handing over the land

and any construction in process, borrowers could, as Rowe stated, "just walk" with no loss at all.

142.    Further, because of the 100% LTV, "no money down" structure, National City was exposed to 100% of the risk making it extremely likely the bank would experience severe losses upon default.  The land, the acquisition of which was financed through a 100% LTV loan, was National City's only (albeit illusory) collateral on such loans upon default. As a result of the continued decline of the housing and property market this collateral would be worth less to National City, thereby exacerbating loss severities.  The construction collateral (e.g., architect and engineering plans, studies, permits; physical materials; partial residence construction, etc.) were of nominal value to the bank.  Accordingly, the Company was facing significant losses on the funds advanced for the land and nearly 100% loss severities on the construction funds.

143.    While National City admitted to "bad product design" in September 2007, they simultaneously misrepresented and minimized the scope of their default risks and failed to disclose their loss severity risks, thus misrepresenting the financial impact of Construction Loan losses. In September 2007 Defendants represented that only a subset of the Construction Loan portfolio totaling $250-$400 million (e.g. Florida properties being constructed for investment rather than as primary/secondary residences) was affected by the bad product design.  However, National City admitted on January 22, 2008 that loans *throughout* the $3.1 billion Construction Loan portfolio (i.e., including primary/secondary residence properties) were affected.  On January 22, 2008, National City admitted that it had been experiencing Construction Loan loss severities of 50%, and

on April 21, 2008, admitted that it expected to experience loss severities of 50%-95% based on the amount of construction that had been completed prior to default.

144.    As discussed above, these Residential Construction Loans, which totaled approximately $3.1 billion as of December 31, 2008, were at extreme risk of default and would experience exceptionally high loss severities upon default.   Yet, this information, which was admittedly known no later than "late 2006", was not made known to the participants until at least September 2007.   Indeed, National City's true loss expectations were not disclosed until at least April 2008.   In addition, National City disclosed an additional $4.5 billion in exposure to commercial construction loans made to residential real estate developers as of December 31, 2007.   In total, this admittedly high-risk construction loan exposure totaled approximately $7.6 billion as of December 31, 2007. None of this exacerbated loan-loss exposure was disclosed to the Plan Beneficiaries, nor did the Plan Fiduciaries provide an adequate description of the risk and return characteristics of National City's common stock as they related to these risky products.

145.    The loans retained as a part of National City's First Franklin retention strategy undoubtedly included the above, extremely risky loan products.   In its most recent Form 10-K, filed for fiscal year end 2007, National City disclosed:

> **Nonprime mortgage loans, which include both first and second lien mortgages, were originated by the Corporation's former First Franklin unit which was sold in late 2006**. Nonprime mortgage loans were generally not readily salable in the secondary market to the GSEs for inclusion in mortgage-backed securities due to the **credit characteristics of the borrower, the underlying documentation, the loan-to-value ratio, or the size of the loan, among other factors**. However, **prior to 2007, these loans were generally salable to other third-party investors. Nonprime mortgage loans included interest-only loans and loans with various borrower**

**documentation levels**. The Corporation has never offered mortgages with negative amortization. [Emphasis added]

146.    Further, National City disclosed:

As of December 31, 2007, interest-only and second-lien loans comprised 21% and 25% of the portfolio, respectively. The average FICO scores associated with first-lien and second-lien loans were 616 and 637, respectively, at December 31, 2007.

**National City's Home Equity Loans and Lines of Credit**

147.    In addition to the significant exposure to construction loans and subprime nonprime mortgages discussed above, during the Class Period National City also has significant exposure to another extremely risky family of loan products known as "Home Equity Products."  Home equity loans and/or home equity lines of credit are generally, though not always, second lien products.  National City had significant exposure to these types of home equity products, including $3.7 billion in home equity loans and $7.5 billion in home equity lines of credit, for a total of approximately $11.2 billion in high-risk home equity products as of December 31, 2007.  By their very nature second lien products are more risky than other loan products because of their subordinated collateral position.  That is, the first lien holder would have access to the collateral (usually the property purchased with the proceeds from the mortgage), while the second lien holder has a junior position that is subordinate to the first lien.

148.    According to National City's own admission: "…second lien mortgages pose a higher risk of loss as the underlying collateral associated with these mortgages will be first applied to satisfy the first lien mortgage."  The higher risk discussed by National City comes as a result of the fact that when all is said and done there is generally very little, if anything, left for the holder of a second lien to cover losses.  This is especially

true as the housing market continues to decline and home values continue to fall. The precipitous decline in the housing market that began in 2005 and continues even today has only served to increase the risk in National City's second lien portfolio. Further it is also important to recognize that National City had second lien exposure in its nonprime mortgage portfolio as well: "Nonprime mortgage loans, which include both first and second lien mortgages, were originated by the Corporation's former First Franklin unit which was sold in late 2006."[17]   In fact, as of December 31, 2007, 25% of its $6 billion "nonprime mortgage" exposure ($1.5 billion) was *subprime second lien mortgages*, which include a double layer of risk. None of this information was made available to the Plan Beneficiaries during the Class Period.

149.   National City originated, prior to and during the Class Period, billions of dollars of home equity loans and home equity lines of credit. These loans were originated both "directly" through the National City's retail bank branches and "indirectly" through the Company's National Home Equity ("NHE") division. The direct home equity products were originated for retention in National City's loan portfolio, while the NHE loans were originated for sale into the secondary mortgage market. The loans generated by NHE during 2006 and 2007 (the "NHE Production") had high risk profiles and were exposed to similar risks of loss as the Construction Loans and the Nonprime Mortgage Loans discussed above.

150.   Even in light of this risk, National City continually misrepresented the nature and quality of the NHE Production, and omitted material information about these loans. National City  characterized those loans as "prime" or "prime quality"; insinuated

---

[17] National 2007 FYE Form 10-K, filed with the SEC on February 13, 2008

that they were "conforming" loans by consistently distinguishing NHE-generated loans from the National City's "nonconforming" and "nonprime" loans (which were, according to the National City, generated primarily by its subprime originator, First Franklin); consistently touted National City's purported refusal to underwrite riskier forms of home equity loans such as interest-only loans[18] and ARMs; and consistently failed to disclose that nearly half of the NHE Production had been underwritten on a "stated income" basis. ("Stated income" loans are, by definition, nonconforming, and are, by their very nature, extremely risky loan products.)   However, even though National City's stated income NHE loans were, per se, nonconforming, the Company consistently and misleadingly insinuated that the NHE Production was "conforming" by distinguishing NHE-generated loans from the National City's "nonconforming" and "nonprime" loans.

151.   National City, however, misrepresented the high risk nature of these home equity loans by calling them "prime quality":

> **The National Home Equity business** unit within NCF [National's National Consumer Finance division] **originates, primarily through brokers, <u>prime quality home equity loans</u>** outside National's banking footprint. During 2006, NCF implemented a strategy to originate-and-sell all nonfootprint, broker sourced **originations of nonconforming mortgage loans and home equity lines and loans**. The Corporation sold $5.5 billion of home equity lines of credit and $2.3 billion of home equity loans during 2006. **Nonconforming mortgage loans were originated by First Franklin**, principally through wholesale channels, including a national network of brokers and mortgage bankers.[19]

---

[18] According to the 2007 FYE Form 10-K, filed with the SEC on February 13, 2008, 21% (approximately $1.3 billion) of National's $6 billion in subprime mortgage exposure were interest-only loans.

[19] National 2006 FYE Form 10-K, filed with the SEC on February 8, 2007

152.    It is clear, based on the above language that National City misleadingly distinguished between "nonconforming" mortgage loans, which were "originated by First Franklin," and the NHE Production.  Such  lack of transparency misled the public (not to mention the Plan Beneficiaries) and, as will be discussed in a subsequent section, violated very basic tenets of GAAP and SEC disclosure rules.

153.    Interestingly,    National    City    abandoned    these    "prime    quality" representations in September 2007.  Since that time, National City has avoided describing the NHE Production as "prime" or "prime quality": "This business originates residential mortgages, home equity loans, and home equity lines of credit within National City's banking footprint and on a nationwide basis."[20]  Moreover, National City ceased its attempt to distinguish NHE loans from the Company's "nonconforming" loans.  Instead, choosing to use the term "non-agency" and "non agency-eligible" loans:

> During the third quarter of 2007, the mortgage markets experienced unprecedented disruption **resulting in an inability to sell certain non-agency eligible mortgage and home equity products**. As a result, management curtailed the production of broker-originated home equity lines and loans and transferred approximately $4.4 billion of unsaleble home equity lines and loans to portfolio. Further, **management curtailed the production of non-agency eligible first and second mortgages originated by both its retail and wholesale channels and** significantly reduced residential construction lending.[21] [Emphasis added]

154.    At the same time National City changed the way it described its NHE product, the Defendants also began disclosing the significant financial fallout resulting from the home equity products.  During a September 6, 2007 conference call, National

---

[20] National third quarter 2006 Form 10-Q, filed with the SEC on November 13, 2007

[21] National third quarter 2006 Form 10-Q, filed with the SEC on November 13, 2007

City began to slowly come clean about the NHE Production.  Rob Rowe, National City's Chief Credit Officer, revealed for the first time that the NHE Production had a "higher stated income content" than was present in the Company's other home equity loan portfolios.  This may be the first time that National had stated publicly that its home equity portfolio contained stated income loans.  As discussed earlier, stated income loans are, by definition, nonconforming, and the existence of such loans within National City's NHE portfolio was in direct contradiction to National City's allusions that the NHE portfolio was "prime quality" and that the NHE portfolio held "conforming" loans.

155.    Additionally, Jeff Kelly, National City's Vice Chairman and CFO, admitted that National City had weaknesses with regard to its underwriting when he said that National City was "investigating our underwriting practices to firm those up as soon as possible."[22] Mr. Kelly further admitted that "we have allowed ourselves to get a little less disciplined in that area than we probably should have."[23]   Nevertheless, National City continued to maintain that the NHE Production, apart from the "stated income" component, was largely of the same nature and quality as the prime home equity loans that National City originated for its own portfolio, which was untrue as eventually disclosed on January 22, 2008.

156.    On October 24, 2007, National City issued its financial and operational results for the third quarter of 2007.  During the October 24, 2007 conference call, Mr. Rowe revealed that the "higher stated income" content of the NHE Production as compared with the Company's home equity portfolio loans was in fact much, much

---

[22] National September 6, 2007 conference call

[23] National September 6, 2007 conference call

higher.  In truth, unbeknownst to the public, 40% the NHE Production had been
originated on a "stated income" basis:

> Thus, the total **national home equity runoff portfolio** now
> totals $10.7 billion. Note that both the original held for
> investment book and held for sale book share similar
> characteristics in terms of loan devalue [sic, should be
> "loan-to-value"] and FICO and purpose, **except that the
> held-for-sale book held higher percentage of stated
> income**, roughly 40% versus the original 10%. [Emphasis
> added]

157.    Regardless of any other credit similarities, the fact that 40% of the NHE
Production was originated on a stated income basis increased the credit risks of those
products immensely.  Yet, National City had consistently downplayed the increased risks.

158.    In truth, and contrary to National City's attempts to communicate
otherwise, the objective credit quality and risk characteristics of the NHE Production
were fundamentally worse than National City's other home equity loans: the NHE
Production were originated at higher loan-to-value levels, to less credit-worthy
borrowers, and/or for properties concentrated in the areas of the country experiencing the
sharpest real estate price declines.

159.    The above characteristics are the same or similar to the risk characteristics
related to subprime loans.  However, Defendants did not finally admit this publicly until
January 2008. On January 22, 2008, National City admitted that "the quality and other
characteristics" of the NHE Production home equity loans were "visibly worse" than the
prime home equity loans that the bank had originated for itself.  According to Mr. Rowe:

> ROWE: …the **more recent National Home Equity
> vintages**. Again, this segment represents loans originated
> for sale and underwritten to capital market standards, but
> which could not be sold or were kicked out of trades and
> were transferred from the held-for-sale warehouse to

portfolio. **The <u>quality and other characteristics of these loans are visibly worse than those underwritten for our portfolio</u>**. Again, compared to the older vintage, **this portion of the portfolio has fewer balances above 730 FICO and more balances above 90% loan to value**. As you can see by the trending provided, **this segment has exhibited meaningful deteriorating conditions. We have increased the reserves significantly during the fourth quarter for this portfolio to reflect our view of much higher loss content in the future**.

* * *

ROWE: **For the National Home Equity portfolio, primarily the most recent vintage, the higher component of stated income product, reliance on broker originations, and the geographic concentrations and markets subject to home price depreciation, distinguish it from our direct branch-based customer portfolio and heavily influence our outlook on losses**. [Emphasis added]

160.    Based on this disclosure, contrary to the September and October 2007 representations that, over and above the stated income issue, the credit characteristics and quality of the NHE Production held for sale book were similar to those of National City's held for investment book, it is clear that the NHE Production loans were, in fact, *not* similar to the home equity loans and home equity lines that National City originated for retention.

161.    Unbeknownst to the public, or the Plan Beneficiaries, until at least the end of January 2008, the NHE Production had "exhibited meaningful deteriorating conditions" because the NHE Production loans were made to less creditworthy borrowers, had riskier, higher loan-to-value terms, and/or were made on properties concentrated in areas of greatest home price depreciation.   Contrary to previous statements, National City finally concluded that these facts, together with the previously-

disclosed high percentage of stated income loans did, in fact, "distinguish it [the NHE Production] from our direct branch-based customer portfolio and heavily influence our outlook on losses."

162.   National City's NHE Production, however, was not its only exposure to home equity products.  As discussed above, National exposure to admittedly high-risk *broker sourced* Home Equity Products totaling approximately $11.2 billion, including $3.7 billion in home equity loans and $7.5 billion in home equity lines, as of December 31, 2007.

163.   According to National City's most recent Form 10-Q, filed with the SEC on May 12, 2008 for the first quarter of 2008, the bank was still exposed to $22.9 billion admittedly high risk assets as of March 31, 2008 (down from $24.8 billion as of December 31, 2007).  As a result of this exposure, which was not fully disclosed until, the earliest, February 2008 when the 2007 fiscal year Form 10-K was filed with the SEC, National City has already taken billions of dollars in write downs on these assets and announced that the bank's net remaining expected losses as of April 21, 2008 would range from approximately $3.3 billion to approximately $3.8 billion.  On May 21, 2008, National City made a presentation at the Lehman Brothers Annual Financial Services Conference.  The following is a copy of slide 24 from that presentation, where National City presented its loss expectations in its liquidating portfolio:

# *Liquidating Portfolio - Loss Expectations*

**As of March 31, 2008**
**($ in millions)**

| | 3/31 Current Pool Balance | Net Remaining [2] Expected Loss $ |
|---|---|---|
| **National Home Equity** | | |
| Originated for Portfolio | $4,546 | $300 - $400 |
| Originated for Sale | $6,239 | $1,700 - $2,000 |
| **Total National Home Equity** | **$10,785** | **$2,000 - $2,400** |
| | | |
| **Non Prime Mortgage [1]** | | |
| First Liens | $3,978 | $300 |
| Second Liens | $1,283 | $450 |
| **Total Non Prime Mortgage** | **$5,345** | **$750** |
| | | |
| **Construction - Perm Portfolio** | **$2,673** | **$550 - $625** |

[1] Includes expected mortgage insurance recoveries
[2] Estimate as of April 21, 2008

24

**National City.**

164.    Considering the huge losses already taken on National City's high risk exposure, as well as the $3.3 billion to $3.8 billion[24] in additional expected losses moving forward, there is no question that the "writing was on the wall" for National City much earlier than the end of 2007 and/or beginning of 2008 with regard to the risks of these assets, the likelihood that they would default, and the huge losses that would ensue as a result.   Based on National City's accounting for these losses, the uninformed observer would be led to believe that the Defendants were ostensibly "blindsided" by a sudden downturn in the market that engendered such massive problems.   However, National City clearly knew or should have known that these losses unequivocally existed at a much earlier point during the Class Period and National City should have accounted for them appropriately, or, *at a minimum*, warned the public, including the Plan Beneficiaries, of National City's enormous inherent exposure to risk.

165.    This is especially true with regard to what was known both *during and before the Class Period* about the significant declines in the housing and subprime mortgage markets, as well as the explicit warning issued by the FASB in *December 2005* regarding many of the high-risk nontraditional loan products that have caused National City's recent losses, discussed in the following section.

**"The Writing Is On The Wall"**

166.    On October 24, 2007, National City shocked the markets by taking a $152 million loss in its mortgage banking business.   According to its press release issued that day:

> President and CEO Peter E. Raskind commented, "Our third quarter results were clearly affected **by the unprecedented**

---

[24] Note: According to National's disclosure, the $750 million net remaining expected losses for its Nonprime Mortgage Loans was net of mortgage insurance recoveries.  According to the April 21, 2008 conference call, "Gross losses before mortgage insurance would be approximately $1.2 billion."  This is a difference of approximately $450 million.  Based on this alone, the $3.3-$3.8 billion *net* expected loss is $3.75-$4.25 billion on a *gross* basis.  Considering the difficulty many financial insurers are currently facing, there it is at least reasonably possible that National won't recover on all or a portion of such mortgage insurance.

**disruption and weakness in the mortgage and housing markets**.
**In response to these conditions, we have restructured our
mortgage business."** [Emphasis added][25]

167.    National City may argue that its actions to redress its mortgage exposure, namely

to "restructure" the mortgage business, were appropriately timed, and that the company could not

have reasonably foreseen the damage to its mortgage portfolio.  However, the mortgage debacle

did not happen overnight.  Overt and unequivocal warning flags existed well before National

City disclosed such exposure to the public, much less to the Plan Beneficiaries.

168.    Long before National City revealed its pervasive exposure to risky residential

mortgage products, the mortgage bubble showed signs of bursting, and according to Nomura

Securities, as far back as April 2005, a lender like National City could not claim to be surprised.

> Claims of surprise — and even dismay — about developments in
> the sub-prime mortgage sector seem unfounded. Neither business
> professionals nor policymakers (including legislators, legislative
> staff, and regulators) can honestly claim to have been surprised.
> **Actual surprise arguably could have come only from willful
> ignorance of market conditions over the past several years.
> Feigned surprise likely represents attempts to garner
> sympathy, to dodge responsibility, or both.**[26] [Emphasis added]

169.    In April of 2005, the bond rating agency, Standard and Poor's made the following

comments concerning affordability products:

> As early as April 2005, we communicated our concerns to the
> market about new "affordability" mortgage products.[27]
>
> …there is growing concern around the increased usage of these
> mortgages in new RMBS securitization, which may pose
> significant credit risk.  According to Standard & Poor's credit
> analyst Ernestine Warner, a director in RMBS Surveillance, **some**

---

[25] National 8-K, 10/24/07.

[26] "Sub-prime Surprise…Not!" Nomura Fixed Income Research, April 18, 2005

[27] "S&P Ratings on US Subprime Mortgage and Related Securities: Key Facts,"
www.standardandpoors.com

> **of the inherent risks that may arise include payment shock due
> to interest rate increases, coupled with the addition of principal
> repayment, undercollateralization with regard to negative
> amortization, and home price depreciation.[28] [29]** [Emphasis
> added]

170.   A September, 2005 Nomura article indicated that affordability products, like the
ones National City offered were so toxic that their excess use could be contributing to a
speculative "bubble" in the "mortgage-backed securities" ("MBS") market.  According to
Nomura:

> Against the backdrop of a strong rating performance for MBS,
> concerns are growing about the possible impact of "bubble"
> conditions in the U.S. residential real estate market.  **Those
> concerns are amplified and aggravated by the growing use of
> so-called "affordability" mortgage products such as interest-
> only mortgage loans, adjustable rate mortgage loans, and loans
> that allow for "negative amortization."**[30]

171.   A July 26, 2005 *Wall Street Journal* article also commented on the loose lending
standards and products offered by banks, such as National City:

> Mortgage lenders are continuing to loosen their standards, despite
> growing fears that relaxed lending practices could increase risks
> for borrowers and lenders in overheated housing markets.
>
> **Novel loan products have helped fuel much of the run-up**…
>
> In one recent move, Chase Home Finance, a unit of J.P. Morgan
> Chase & Co., this spring [sic] **began allowing some of its
> customers to take out home-equity and lines of credit without
> having their incomes verified.** Under the new program, income
> verification isn't required for home-equity loans of up to
> $200,000…**Loans with little or no documentation have grown
> in popularity industry-wide**

---

[28] Home price depreciation is an important aspect of the housing bubble, and is discussed at length at (xx-
xx).

[29] "S&P Comments On Risk In Newer Mortgage Products, As Discussed At Industry Event," April 6, 2005

[30] "Update on U.S. Fixed Income Market Conditions," Nomura Fixed Income Research, September 7, 2005

**But the lowering of standards has also raised concerns that some borrowers may run into trouble making their payments and that defaults could rise.**[31] [Emphasis added]

172.     In a rare move, the Financial Accounting Standards Board ("FASB") staff issued a warning entitled Staff Position SOP 94-6-1 "Terms of Loan Products That May Give Rise to a Concentration of Credit Risk." This authoritative promulgation was meant to serve as a warning about the risks inherent in subprime mortgages. According to FASB chairman Robert Herz:

> …at a conference Thursday morning [May 1, 2008], FASB chairman Robert Herz reminded both investors and preparer that his staff issued an unusual six-page "reminder" back in December 2005 that warned that investments in subprime mortgages were risky.[32]

173.     This was an "unusual" step by the FASB because it does not often issue such "warning" promulgations.  By taking the "unusual" step of issuing such a warning in December 2005, the FASB underscored the inherent exposure that plagued these risky loan products in which National City specialized.

**The Impairment of National City's Assets (High Risk Asset Impairment and Lack of Adequate Loan Loss Reserves)**

174.     A number of authoritative accounting pronouncements have been designed to require recognition of undisclosed losses inherent in existing extensions of credit, as well as to provide elaborate procedures, interpretations, and guidelines for identifying and disclosing such losses and related contingencies.   These pronouncements discuss the need for charging off (writing down) impaired assets to their realizable value and/or reserving for the possibility of a decrease in value of a receivable resulting from the extension of credit.   Various authoritative accounting bodies, including the SEC, the AICPA, and the FASB, among others, have all

---

[31] "Mortgage Lenders Loosen Standards." *The Wall Street Journal*. July 26, 2005.

[32] "FASB on Subprime: 'We Warned You,'" CFO.com, Tim Reason and Marie Leone, May 1, 2008

commented on this issue.  Accounting for loans is a significant topic that has been accorded considerable focus in the relevant GAAP framework, particularly in the context of loss contingencies.

175.    Statement of Financial Accounting Standards No. 5 – Accounting for Contingencies ("SFAS 5").   Provides guidance on the accounting and reporting for loss contingencies, including credit losses.   The first paragraph defines a contingency as "…an existing condition, situation, or set of circumstances involving uncertainty as to possible…loss (hereinafter, a "loss contingency") to an enterprise that will ultimately be resolved when one or more future events occur or fail to occur." [Emphasis added]

176.    Pursuant to SFAS 5, ¶8, an entity is required to accrue for a loss contingency, with a concomitant charge to the income account, when both of the following elements are met:

a.      Information available prior to issuance of the financial statements indicates that it is **probable that an asset has been impaired** or a liability incurred at the date of the financial statements.  It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.

b.      The **amount of loss can be reasonably estimated**. [Emphasis added]

177.    In order to accrue a contingent loss under SFAS 5, the loss must be both "probable" and "reasonably estimable."  SFAS 5 indicates that the term probable is defined as: "The future event or events are likely to occur."[33]  The pronouncement goes on to state that in order for the financial statements not to be misleading, disclosure of the nature and/or the amount of an accrual may be necessary.[34]  Based on this information, loan losses should be reserved for when those losses are both "probable" and "reasonably estimable."

---

[33] SFAS 5, ¶3(a)

[34] SFAS 5, ¶9

178.    In addition, because of the significance of contingencies, the FASB left considerable room for disclosure of loss contingencies even when both of the above conditions (i.e. "probable" and "estimable") have not been met.  SFAS 5, ¶10 clearly states:

> **If no accrual is made for a loss contingency because one or both of the conditions in paragraph 8 are not met**, or if an exposure to loss exists in excess of the amount accrued pursuant to the provisions of paragraph 8, **disclosure of the contingency shall be made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred.**  The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made…

179.    The above language indicates that disclosure of the contingency shall be made when it is "reasonably possible" (versus, e.g., "probable") that a loss may have been incurred, even if the loss cannot be reasonably estimated, as required under SFAS 5, ¶8.  It is important to note that SFAS 5 defines "reasonably possible" as: "The chance that the future event or events will occur is <u>more than remote but less than likely</u>."[35] [Emphasis added]   Based on the above, even when a loss is "less than likely," or when the loss cannot be estimated, *disclosure* of a loss contingency is still required by GAAP.  In fact, SFAS 5 goes on to state: "If disclosure is deemed necessary, the financial statements shall indicate the nature of the loss or loss contingency and give an estimate of the amount or range of loss or possible loss or state that such an estimate cannot be made."

180.    The following chart represents the loss contingency decision-making process:

---

[35] SFAS 5, ¶3(b)

Loss Contingency Flow Chart



181.    SFAS 5, ¶22 specifically relates this pronouncement to loan situations by stating:

> The assets of an enterprise may included receivables that arose from credit sales, **loans**, or other transactions. The conditions under which receivables exist usually involve some degree of uncertainty about their collectibility, in which case a contingency exists as defined in paragraph 1. [Emphasis added]

182.    In fact, SFAS 5 is one of the primary drivers behind the allowance for loan losses. Finally, it is important that the FASB clarified that a loss need not be a virtual certainty before a loss contingency is required. In fact, SFAS 5, ¶84 states that, "Those conditions [i.e. probable and estimable] **are not intended to be so rigid that they require virtual certainty before a loss is accrued**." [Emphasis added]

183.    National City's high risk loans, including the Construction Loans, Nonprime Mortgage Loans, and Home Equity Products, were characterized by inherent (contingent) losses that were not appropriately recognized, nor properly disclosed, pursuant to the requirements of SFAS 5.  Despite the clear and unequivocal nature of the disclosure requirements under SFAS 5, especially in the face of the ever-deepening housing crisis, National City did not even disclose

the "possibility" of significant impairment of its admittedly high-risk exposure until those losses had already occurred, let alone appropriately reserve for the losses through the ALL.

184.    There were many other fundamental principles of GAAP that were violated by National City in its financial reporting practices including, but not limited to, the provisions of: FI N 14 - "Reasonable Estimation of the Amount of a Loss";

- SEC Staff Accounting Bulletin, Number 102 -- Selected Loan Loss Allowance Methodology and Documentation Issues;

- Item 303 of Regulation S-K -- "Management's Discussion and Analysis of Financial Condition and Results of Operations";

- Statement of Position 94-6 -- "Disclosure of Certain Significant Risks and Uncertainties";

- Statement of Financial Accounting Standards Number 107 -- "Disclosures about Fair Value of Financial Instruments"; as well as

- numerous provisions of regulatory and GAAP accounting relating to the Allowance for Loan and Lease Losses ("loan loss reserve") and the disclosure of nonperforming loans.

**National City's Allowance for Loan Losses**

185.    The allowance for loan losses, also referred to as the loan loss reserve, is a general reserve account maintained by banks to absorb loan losses.  It has been historically proven in banking that regardless of how good (or bad) a bank's underwriting is, the bank will experience certain levels of loan losses.  To absorb these losses, banking institutions maintain an allowance for loan losses ("ALL").  In essence, the ALL can be viewed as a pool of capital specifically set aside to absorb estimated loan losses.  As a result, managing the ALL is an important way that a bank manages its credit risk, and directors are responsible for ensuring that the ALL balance is

adequate.  National City was required to and purported to maintain an adequate ALL on its portfolio loans.

### National City's Reserve Policy

186.    According to National City's 2006 fiscal year end Form 10-K: "The allowance for loan losses addresses credit losses inherent in the loan and lease portfolio and is presented as a **reserve against portfolio loans on the balance sheet**."  [Emphasis added] Further:

> **The allowance for loan losses is maintained at a level believed adequate by management to absorb probable losses inherent in the loan portfolio and is based on the size and current risk characteristics of the loan portfolio**, an assessment of individual problem loans and actual loss experience, probable recoveries under lender paid mortgage insurance, **current economic events in specific industries and geographical areas**, including unemployment levels, and other pertinent factors, including regulatory guidance **and general economic conditions**. Determination of the allowance is inherently subjective as it requires significant estimates, including the amounts and timing of expected future cash flows on impaired loans, estimated losses on pools of homogeneous loans based on historical loss experience, insurance coverage limits, and consideration of current environmental factors and economic trends, all of which may be susceptible to significant change. Loan losses are charged off against the allowance, while recoveries of amounts previously charged off are credited to the allowance. A provision for credit losses is recorded based on management's periodic evaluation of the factors previously mentioned, as well as other pertinent factors. Evaluations are conducted at least quarterly and more often if deemed necessary. When portfolio loans are identified for sale or securitization, the attributed loan loss allowance is reclassified to held for sale as a reduction to the carrying value of the loans. If a loss attributable to deterioration of the creditworthiness of the borrower is anticipated upon sale, a charge-off is recognized upon transfer.

187.     It is clear that National City did not adequately reserve for the losses inherent in its admittedly high-risk exposure assets, which totaled $21.3 billion and $24.8 billion as of the December 31, 2006 and December 31, 2007, respectively, nor did it appropriately disclose even

the *possibility* of loss (as required by SFAS 5, ¶10) of those losses, which based on contemporaneous information and events, were known or should have been known.

188.    This is evidenced by the fact that National City actually *decreased* its ALL during the first quarter of 2007 by $27 million, even in the face of the other significant problems it was facing with regard to its Construction Loans, Nonprime Mortgage Loans, and Home Equity Products.  National City then *increased* its ALL by $237 million, $389 million in the third and fourth quarters of 2007, respectively, followed by a whopping $820 million increase in the first quarter of 2008.

189.    Each subsequently larger charge was especially egregious because National City had stated in each respective SEC filing, "The allowance for loan losses is maintained at a level believed adequate by management to absorb probable losses inherent in the loan portfolio…" However, each subsequent significant increase to the ALL proved that statement to be inaccurate and misleading.

190.    Even after previously asserting that National City's management believed the ALL to be adequate to absorb probable losses, the Company increased its reserve by an astronomical $1.4 billion during the third and fourth quarters of 2007 and the first quarter of 2008, *related to losses from exposure to high-risk assets that existed as of December 31, 2006 and throughout the Class Period*.

191.    Because of the significant exposure to, among other things, City's stated income, no money down, high loan-to-value products and exposure to certain high-risk affordability products, such as interest-only loans; exposure to numerous second lien positions, as well significant exposure to extremely risky subprime mortgage products; National City should have

increased its loan loss reserves appropriately; yet it failed to do so until those losses had begun to threaten its existence toward the end of 2007.

192.     National City's failure to disclose is exacerbated by the fact that the housing market had been experiencing problems since 2005; numerous mortgage lenders had going out of business since late 2006/early 2007; and the 2005-2007 vintages were known to be the worst performing vintages in history.

193.     Considering all of this, as well as the numerous warnings sounded in the market, National City was, or should have been, aware of its substantial exposure and the likelihood of significant impending losses; yet it chose not to take appropriate action.  Instead, National City continued to maintain inadequate loss reserves and failed to disclose the precariousness of its toxic mortgage and construction loan portfolio during the class period.

194.     It is clear that the loss expectation in during the Class Period, especially in early 2007, was significantly higher in the face of what was known about the contemporaneous performance and underwriting of National City's admitted high-risk assets.

195.     As a result of the significant under-reserving of losses, National City's expenses were materially understated and, as a result, its earnings were materially overstated during the Class Period. Nor did the Defendants provide anything close to adequate disclosure to the Plan Beneficiaries or take appropriate measures to warn regarding the concomitant exposure.

**Nonperforming Loan Classification Fraud**

196.     Compounding National City's misrepresentation of loan nature and quality, as discussed above, National City made material misrepresentations throughout the Class Period regarding the Company's "nonperforming" loans.  According to disclosures made by National City throughout the Class Period, loans were considered to be nonperforming after 90 days

without payment.   According to the following language taken from the 2007 fiscal year end

Form 10-K, filed with the SEC on February 13, 2008:

> **Commercial loans and leases and commercial loans secured by
> real estate are designated as nonperforming when either
> principal or interest payments are 90 days or more past due…**
> [Emphasis added]

197.   While the above language explicitly stated that "commercial loans and leases and

commercial loans secured by real estate" were classified as nonperforming at 90 days past due,

National City made certain representations with regard to residential real estate loans as well:

> Consumer loans are subject to mandatory charge-off at a specified
> delinquency date and, **except for residential real estate loans**, are
> usually not classified as nonperforming prior to being charged
> off.[36]

198.   The above disclosure specifically states that consumer loans were not classified as

nonperforming until they were charged off.  However it makes an explicit exception for

"residential real estate loans," implying that residential real estate loans were classified as

nonperforming prior to being charged off, as they should have been per banking regulatory

requirements.   However, undisclosed to public, and in direct contradiction of the above

disclosure, National City was waiting for its residential real estate loans to go unpaid for *half a

year* (180 days) before declaring them to be nonperforming.[37]   In May 2008, Defendants

admitted:

> **Residential real estate delinquencies decreased compared to
> year end due to the designation of certain of these loans as
> nonperforming at March 31, 2008. After consideration of
> regulatory guidance** in light of the continued deterioration in the
> market value of the underlying collateral in 2008, **a total of $688**

---

[36] National 2007 fiscal year end Form 10-k, filed with the SEC on February 13, 2008

[37] According to banking regulation, loans that reach 180 days past due must be classified "loss" and be
written off completely.

**million of 90+ days past due residential real estate loans were reclassified as nonperforming**. These loans included $294 million of nonprime mortgage, $260 million of residential construction, and $134 million of other mortgage loans. See the corresponding increases in nonperforming loans. **In prior periods, in consideration of market conditions, the practice had been to designate such loans as nonperforming when they reached 180 days past due.** [Emphasis added]

199.    National City's practice of not disclosing nonperforming residential real estate loans when they had exceeded 90 days past due flew in the face of regulatory requirements.  The admission that "a total of $688 million of 90+ days past due loans were reclassified as nonperforming as of March 31, 2008, due to declines in the values of the underlying collateral" as a result of "consideration of regulatory guidance" came as a complete surprise to the public when it was disclosed in May 2008.  At the stroke of a pen, National City had created an additional *two-thirds of a billion dollars* of nonperforming loans.  National City's May 12, 2008 Form 10-Q disclosed the new total exposure to nonperforming assets:

| Nonperforming Loans (in millions) | 3/31/2008 | 12/31/2007 | % Increase |
|---|---|---|---|
| Commercial | $ 218 | $ 149 | 46% |
| Commercial Leases | $ 13 | $ 6 | 117% |
| Commercial Construction | $ 387 | $ 301 | 29% |
| Commercial Real Estate | $ 239 | $ 189 | 26% |
| Residential Real Estate: | | | |
|    Nonprime Mortgages | $ 435 | $ 119 | 266% |
|    Construction | $ 496 | $ 145 | 242% |
|    Other | $ 383 | $ 162 | 136% |
| Home Equity Lines of Credit | $ 88 | $ 19 | 363% |
| Total Nonperforming Loans | $ 2,259 | $ 1,090 | 107% |
| Total Nonperforming Assets | $ 2,752 | $ 1,523 | 81% |
| Nonperforming assets as a percentage of period-end portfolio loans and other nonperforming assets | 2.37% | 1.31% | 81% |

200.    As a result of National City's undisclosed policy, nearly $700 million of nonperforming residential real estate loans were rendered invisible to the public.  Following the

May 2008 reclassification, nonperforming loans increased to *more than twice the amount* disclosed as of December 31, 2007.

201.    As a direct result of defendants' misrepresentation of the National City's exposure to nonperforming loans, certain representations to the public were materially affected.   A primary indicator of the adequacy of loan loss reserves is the ratio of reserves to nonperforming loans. High ratio of reserves to nonperforming loans indicate that a company is relatively well-reserved to cover impending losses from nonperforming loans.  However, as that ratio decreases, so does the apparent adequacy of loss reserves to cover losses from nonperforming loans. *FSP SOP 94-6-1 – "Terms of Loan Products That May Give Rise to a Concentration of Credit Risk"*

202.    FSAB Staff Position SOP 94-6-1 (FSP SOP 94-6-1), issued in *December 2005*, was meant to serve as a warning about the risks inherent in nontraditional loan products (affordability products), including subprime loans.[38]  The FASB chairman, Robert Herz, recently brought this significant provision to the forefront:

> …at a conference Thursday morning [May 1, 2008], FASB chairman Robert Herz reminded both investors and preparers that his staff issued an unusual six-page "reminder" back in December 2005 that warned that investments in subprime mortgages were risky.[39]

203.    While the scope of FSP SOP 94-6-1 is relevant to subprime loans, it is by no means specific to subprime loans only.  This position paper was an "unusual" step because the FASB does not typically issue warning promulgations.   Simply by issuing such a pronouncement, the FASB recognized the gravity of the conditions that existed in the residential mortgage market as far back as *December 2005*, approximately a year before the beginning of

---

[38] Note that the language of FSP SOP 94-6-1 does not specifically mention "subprime" but rather only nontraditional "affordability" products such as ARMs, negative amortization loans, etc.  However, FASB Chairman Herz has specifically stated that it is relevant to subprime mortgage products.

[39] "FASB on Subprime: 'We Warned You,'" CFO.com, Tim Reason and Marie Leone, May 1, 2008

the Class Period. Based on Chairman Herz's comments, it is clear that many of the problems now being faced by National City have resulted from failure to adequately consider the different risk profiles of these nontraditional products.

204. According to FSP SOP 94-6-1, ¶2, "The FASB staff is aware of loan products whose contractual features may increase the exposure of the originator, holder, investor, guarantor, or servicer to risk of nonpayment or realization." [Emphasis added] FSP SOP 94-6-1, ¶2 goes on to provide a non-exhaustive list of features that may increase credit risk including, relevantly: high loan-to-value ratio, multiple loans on the same collateral that when combined result in a high loan-to-value ratio (i.e. piggyback loans and other second lien products), and interest-only loans. It is important to note that National City was and is exposed to these features, which were specifically identified by the FASB in December 2005 as high risk. Savvy participants in the finance markets, including National City, had ample warning that these features were high risk and that problems were on the horizon. This is especially true considering that *the FASB* sounded these warnings loudly and clearly via FSP SOP 94-6-1 in which it specifically warned of the two major causes of National City's current debacle: affordability products and a decline in the housing markets.

205. Not only does exposure to such products increase credit risk and increase the likely of defaults and losses, but the FASB warned that resultant losses would likely manifest on a delayed basis. The FASB warns that the particular features of these loans create an environment where companies cannot rely on traditional loan default patterns to determine loss accruals (i.e. allowance for loan loss), resulting in failure to comply with FASB Statements No. 5 and No. 114:

> **Certain lending products** often have features that provide for reduced payment requirements in the early part of the loan's term

> [i.e. interest-only loans], which **may delay defaults.** For these loans, **evidence of credit losses may not become apparent until the contractual provisions of the loans cause a change in the required payment because the borrower's ability to make reduced initial payments may delay a creditor's determination that the conditions have been met for the accrual of a loss, and the establishment of an allowance for loan losses**, under FASB Statements No. 5, *Accounting for Contingencies*, and No. 114, *Accounting by Creditors for Impairment of a Loan.*[40] [Emphasis added]

206.    The FASB sent a loud and clear warning to those like National City, involved with these high-risk products that losses might manifest in a delayed fashion, and that originators of such loans should be aware of such delay when considering appropriate allowance for loan losses.  However, despite National City's exposure to high-risk products specifically warned of in FSP SOP 94-6-1 and the FASB's specific warning that defaults and losses might be incurred on a delayed basis, National City failed to appropriately identify and reserve for losses until the end of 2007.

207.    The FASB went on to warn about the very problems that have caused losses in some of National City's most risky exposures:

> Additionally, l**oan products may have initial payment requirements that are less than or equal to the contractual interest amount**. T**hese products include** loans commonly called option ARMs, negative amortizing, deferred interest, or **interest-only loans….payment increases [on such loans] could affect a borrower's ability to repay the loan and lead to increased defaults and losses**.[41] [Emphasis added]

208.    National City has specifically admitted to this type of exposure.  According to National City's 2007 fiscal year end Form 10-K:

---

[40] FSP SOP 94-6-1, ¶3

[41] FSP SOP 94-6-1, ¶4

**The Corporation has originated certain nontraditional interest-only** and payment option adjustable-rate mortgage (ARM) **loans, which allow borrowers to exchange lower payments during an initial period for higher payments later**.

209.    In fact, National City stated, **"As of December 31, 2007, interest-only and** second-lien loans **comprised 21%** and 25% **of the [nonprime mortgage] portfolio**, respectively."[42] [Emphasis added]  Based on this disclosure alone, National City was exposed to nearly *$1.3 billion uber-risky subprime interest-only loans* alone.  However, its interest-only exposure doesn't end there: "**In 2007, originations of interest-only loans represented approximately 28% of total production**, and payment-option ARMs less than one percent." [Emphasis]  A similar disclosure for the 2006 fiscal year indicated that interest-only loans represented approximately 21% of total production that year.  Yet, even in light of these warnings, National City seemed to be surprised by its significant losses on these and similarly risky products beginning toward the end of 2007.

210.    Further, the FASB warned about the effects of a downturn in the housing market: "Also, some loans have high initial loan-to-value ratios based on anticipated appreciation of the collateral's value, **increasing the risk of loss if that appreciation does not materialize and the borrower defaults**."[43] [Emphasis added] By December 2005, when this statement was issued, the HPI had already started its precipitous decline and the risk of loss as a result of the fact that the appreciation was, in fact, not materializing was increasing *every quarter* through 2006 and 2007.  In light of this specific warning, when combined with the significant and well documented declines that were being experienced in the housing market during the relevant time, National

---

[42] National 2007 FYE Form 10-K, filed with the SEC on February 13, 2008

[43] FSP SOP 94-6-1, ¶5

City's prolific losses should have been recognized and accrued (or at least disclosed) significantly before they were.

211.    According to the FASB:

> This FSP is **intended to emphasize the requirements to assess the adequacy of disclosures** for all lending products (including both secured and unsecured loans) and **the effect of changes in market or economic conditions on the adequacy of those disclosures.**[44] [Emphasis added]

212.    The above language indicates that the FASB explicitly intended FSP SOP 94-6-1 to emphasize to the preparers of financial statements the importance of considering whether they had disclosed enough information about the risks related nontraditional affordability products and other loans with high credit risk.  Additionally, the FASB emphasized the need to reconsider disclosures in the face of changing market conditions to determine if additional disclosure was required.  However, even as the markets continued to worsen throughout 2006 and the early part of 2007, National City failed to increase its disclosure regarding these products.  As a result of this inappropriate lack of transparency, the public was caught off-guard by the enormity of National City's true exposure to nearly $25 billion of admittedly high risk assets, many of which were included within the scope of FSP SOP 94-6-1;  and National City's related losses.

213.    As the Fed raised interest rates and the housing market began its precipitous decline in 2005, National City found itself in serious trouble.  Even in the face of the mounting subprime problems, National City continued their ill-fated strategy.  In his letter to National City stockholders, Mr. Daberko stated:

> We believe that mortgages are an essential core banking product, providing substantial opportunities for cross selling other products

---

[44] FSP SOP 94-6-1, ¶6

and services. We plan to be well positioned when conditions in the mortgage markets improve, as they inevitably will.[45]

214.     In fact, mortgage markets did not improve. National City ranked among the 10 biggest subprime originators in 2006.[46]   It had become readily apparent that it was time for National City to get out.   At that time, many Wall Street firms were looking to purchase subprime mortgage originators to help them manufacture product for the mortgage-backed securities needed to feed their growing appetite for collateralized debt obligations.   On September 5, 2006, National City issued a press release that stated, "National Corporation (NYSE: NCC) today announced an agreement for Merrill Lynch & Co. (NYSE: MER) to acquire the First Franklin origination franchise and related servicing platform from National." According to terms of the purchase agreement between National City and Merrill Lynch, Merrill Lynch would pay $1.31 billion to National City for the First Franklin business.[47]   According to a National City press release issued on January 2, 2007, "National Corporation (NYSE: NCC) has announced the completion of the sale of the First Franklin origination franchise and related servicing platform to Merrill Lynch & Co. (NYSE: MER), effective December 30, 2006." According to National City's fiscal year end 2006 Form 10-K, and consistent with the information presented in the September 5th press release, the sale resulted in a pretax gain of $984 million, $622 million after tax, or, $1.01 per diluted share.

---

[45] National FYE 2005 Form 10-K, filed with the SEC on February 6, 2006

[46] "National Plunges After Dividend Cut, Stock Sales," *Bloomberg*, David Mildenberg and Elizabeth Hester, April 21, 2008

[47] Purchase Agreement by and between National Bank and Merrill Lynch Bank & Trust dated as of September 5, 2006 ("Purchase Agreement"). Section 1.04. *Purchase Price*.

215.    Much to National City's chagrin, however, this was not the end of its exposure to loans originated by First Franklin.  National City still had a significant amount of First Franklin's nonconforming loans held in its portfolio as a result of its aforementioned strategy of retaining FFFC-originated mortgages rather than selling them to investors.

216.    In fact, as of September 5, 2006, the date of the agreement between National City and Merrill Lynch, it appears that National City had approximately $16 billion in First Franklin loans in its portfolio.  However, Merrill Lynch would not agree to buy National City's FFFC portfolio loans.  The Purchase Agreement specifically carved out National City's "Owned Portfolio"[48] because Merrill did not want those loss-plagued assets.

217.    Instead, National City and Merrill entered into a separate transaction by which Merrill opted to buy only a small portion, $5.6 billion, of National City's First Franklin portfolio loans.

218.    According to the September 5, 2006 press release, "In a separate transaction, National also expects to sell the Merrill Lynch's whole trading unit approximately $5.6 billion of First Franklin-originated mortgage loans from National's loan portfolio."  Based on this information it appears that Merrill Lynch went through National City's $16 billion First Franklin-originated portfolio and carved out the "good" loans, leaving National City with approximately $10 billion of extremely toxic subprime loans, which very likely included high-risk "affordability products,"  that even Merrill wouldn't touch.

219.    For perspective, Merrill's then-CEO, Stan O'Neal, was fired for his extremely aggressive actions in the subprime arena; yet, even Merrill, who has been particularly hard hit with subprime-related write-downs, refused the remaining mortgages.  In short, Merrill, *who*

---

[48] All loans originated by First Franklin and subsequently sold to National.

*actually wanted to buy subprime loans* did not want these $10 billion.  The $10 billion worth of loans that Merrill would not touch appear to have been the worst of the worst; unsellable even at a time when the subprime mortgage markets were booming; these uber-risky loans were of markedly lower creditworthiness than even the vilified run-of-the-mill subprime.  However, National City told investors not to worry:

> Following the expected portfolio sale, National will continue to hold approximately $10 billion of First Franklin originated loans, substantially all of which have some form of credit risk protection either through lender-paid mortgage insurance or a credit risk transfer agreement.  National management will continue to consider strategic options for the remaining portfolio, including sale, securitization or ongoing retention and run-off over time.

220.   Regardless of such credit risk protection, these assets were, fundamentally, subprime mortgage loans with ever-increasing loss expectations.

221.   The risks related to such assets were clear, even then.   According to a *MarketWatch* article published the same day as the announcement of the First Franklin sale:

> Subprime mortgages, which are extended to homebuyers with less-than-perfect credit ratings, have become riskier as the housing market has begun falling faster than expected and as defaults have started rising See bank story.
>
> Speaking at a banking conference a few weeks ago, **Daberko warned he had seen a marked increase in first-payment defaults on loans, while average balances in checking accounts were dropping and there were more and more overdrafts, with consumers "getting stretched big time now."**
>
> But National said it will continue to hold approximately $10 billion of First Franklin originated loans, "substantially all of which have some form of credit risk protection either through lender-paid mortgage insurance or a credit risk transfer agreement."
>
> **First Franklin specializes in subprime in California, one of the markets where speculation helped fuel some of the steepest increases in home prices in the country over the past few years**

**and where defaults on mortgage payments surged in July.**[49]
[Emphasis added]

222. However, this $10 billion pool of remaining super risky does not represent *all* of National City's true exposure. National City, in a "Mid-Quarter Update" for the fourth quarter 2006 filed with the SEC on December 14, 2006, announced:

> …$3.6 billion of First Franklin loans that had been in portfolio but moved to held for sale as September 30 were sold in November for a small gain. **The total amount sold was less than originally planned due to payoffs and exclusions permitted by the sale contract**. [Emphasis added]

223. Based on the above language, it appears that National City had only managed to sell $3.6 billion of First Franklin mortgages to Merrill (rather than $5.6 billion) because Merrill "exclud[ed]" some of the mortgages from its purchase. During a January 23, 2007 conference call, the Defendants spoke at length about the First Franklin loans National City had failed to sell. According to Jim Bell, an Executive Vice President and Chief Risk Officer of National City at the time, "At the final close in November, Merrill and another buyer purchased $3.3 billion of those loans and $1.6 billion of those loans fell out of the sale…" That is, approximately $1.6-$1.7 billion of the First Franklin loans that National City attempted to sell were rejected by Merrill and were returned to National City.

224. As before, National City told investors not to worry. In fact, National City represented that there was nothing fundamentally wrong or alarming with respect to those returned loans, but that the loans were merely "unsuitable" in light of the particular needs of the purchaser, merely having "documentary deficiencies[50]" that made them not fit in the buyer's

---

[49] "National sells First Franklin to Merrill for $1.3 billion," *MarketWatch*, Nick Godt, September 5, 2006

[50] Pursuant to the terms of most securitization agreements, "document deficient" mortgages are subject to requirements for repurchase by the issuer. This is because, among other things, the rate of losses associated with such mortgages is inordinately high.

planned securitization, and that National City would repair those deficiencies and sell the loans to other purchasers.  However, National City was unable to do so during the end of 2006 and the first two months of 2007, even when the subprime markets were booming.

225.  In March 2007, defendants acknowledged that the subprime market had effectively collapsed in late during February 2007, that it was no longer possible to sell subprime loans, and that National City would thus have to keep the $1.6-$1.7 billion of rejected loans:

> DABERKO: …At the time we agreed to sell the First Franklin franchise, we also made the decision to sell parts of the retained portfolio, essentially the loans not covered by some form of insurance or the credit default swap... **For the loans we did sell, the buyers were more selective in rejecting loans from the pool, mainly due to documentation issues and also more aggressive in asserting their recourse rights**. The higher recourse reserve requirements reduced loan sale revenue and contributed to a loss on one of the sales.

> \*  \*  \*

> JIM BELL: ... **Before leaving the topic of First Franklin, I want to make a brief observation about the first mortgage loans remaining in held for sale that fell out of the previously announced sale**. These are first mortgages that were written during the first half of the year 2004 and before. They are seasoned loans. They are performing well. Of the $1.7 billion of these loans at 12/31, 82% were current and 13% were within the 30-day category. **As Jeff said, they're principally documentary errors that need to be is underway as we speak to repair these documentary deficiencies and then to sell the loans back into the more liquid securitization market toward the end of this quarter**.

> \*  \*  \*

> JIM BELL: ...**At the final close in November, Merrill and another buyer purchased $3.3 billion of those loans and $1.6 billion of those loans fell out of the sale, and as Jeff mentioned and as I alluded to in my comments, those were principally good current loans, but which had documentary deficiencies, which rendered them not usable in the securitization that the buyer was planning. We are working at this point to correct**

**those documentary deficiencies for those loans where they can be corrected and to redeliver them into the marketplace at the securitization prices**.

226.    When all was said and done National City was forced to keep, *at a minimum*, an additional $1.6 billion of the originally announced $5.6 billion sale.   Merrill, *who actually wanted to buy subprime loans*, did not want these additional $1.6-$1.7 billion either.   As a result, not only did Merrill carve out the original $10 billion as loans it specifically didn't want, but Merrill also rejected an additional $1.6-$1.7 billion of the loans that National City attempted to sell.   This left National City with, *at a minimum*, $11.6 billion (original $10 billion originally rejected + $1.6 billion subsequently rejected) in exposure to uber-risky FFFC-originated loans that were specifically rejected by Merrill.[51]

227.    National City had a responsibility under GAAP to account for this, and other similar, subprime exposure, especially exposure to extremely risky "affordability products," correctly by, among other things, appropriately disclosing the risks and setting appropriate loss reserves based on the risk of loss inherent in the asset.

228.    However, this minimum of $11.6 billion FFFC-originated retained portfolio rejected by Merrill Lynch, of which $6 billion remained as of December 31, 2007, does not end National City's post-sale exposure with respect to First Franklin.   In a Form 8-K filed with the SEC on April 21, 2008, National City disclosed that Merrill Lynch had filed an indemnification

---

[51] National also announced (during an October 17, 2006 conference call) an additional agreement to sell $800 million of First Franklin loans, further reducing their First Franklin portfolio. However, the December 14, 2006 Mid-Quarter Update downsized the earlier-reported deal to, stating that National only expected to sell $650 million.  According to the January 23, 2007 conference call: "We started with an $800 million sale. We had $110 million of paydowns and we have about-- we sold $600 million and we have **about $100 million that were kicked out for various reasons and remain in the held for sale portfolio**." [Emphasis added]  This would increase the above minimum $11.6 billion exposure by an additional $100 million.  Further, according to the January 2007 conference call the original $5.6 billion was for first lien FFFC-originated mortgages, and the $800 million sale was for second lien FFFC-originated mortgages.  Therefore, the relevant $100 million in rejected loans were even more toxic *subprime second lien* mortgages, which include a double layer of risk.

claim notice regarding essentially claiming that National City misrepresented alleged losses associated with buying back certain FFFC loans.  According to the *Wall Street Journal*:

> National Corp. said that **a Merrill Lynch & Co. unit wants it to cover some losses associated with loans repurchased by subprime lender First Franklin Mortgage Co.**, which Merrill acquired in 2006 from National.
>
> In a filing, the company said Merrill Lynch Bank & Trust Co. alleged that National Bank has breached certain representations in the First Franklin agreement. **The unit said it is seeking to be indemnified against First Franklin's alleged losses associated with its claimed repurchase of loans**.
>
> National and Merrill Lynch wouldn't discuss the amount of losses the unit is seeking to be indemnified against. A spokeswoman for National declined to comment.[52] [Emphasis added]

229.    According to the Form 8-K, which was filed 11 days after Merrill filed the claim with National City, "Given the preliminary stage of this claim, it is not possible for management to assess the probability of a material adverse outcome, or reasonably estimate the amount of potential loss, if any."

230.     In addition to the remaining FFFC-originated portfolio loans that National City is exposed to[53] and the other subprime exposure which has already caused significant losses at National City, the Company is now exposed to yet additional risk from this new indemnification demand made by Merrill.  As a result of this additional exposure, it is likely that National City's accrued liability for "estimated losses on repurchase and indemnification" is currently too low.

**National City's Memorandum of Understanding**

231.    In addition to the above, and to illustrate the magnitude of the problems at National City, on June 10, 2008, current National City President and CEO Peter Raskind a issued

---

[52] "Merrill Unit Wants Losses Covered," *Wall Street Journal,* April 22, 2008

[53] Totaling $6 billion and $5.3 billion as of December 31, 2007 and March 31, 2008, respectively.

statement regarding certain regulatory matters.  In a press release on that day, National City admitted that it had entered into separate Memoranda of Understanding with two of its regulators:

> Given the potential concerns and misunderstandings that this breach could cause for our many stakeholders, **we can confirm that National entered into Memoranda of Understanding with the Office of the Comptroller of the Currency and the Federal Reserve Bank of Cleveland** on May 5 and April 29, 2008, respectively.   These MOU's address the issues of capital management, risk management, asset quality and liquidity management… [Emphasis added]
>
> 2003
> **First Franklin introduces 100% single liens.**
>
> 2004
> First Franklin releases Stated PlusTM and 30-year fixed products.
>
> 2005
> First Franklin reaches $29.6 billion in volume.  **New products include 40-year amortization loans.**  First Franklin launches EasyWriter® and EasyPrice[TM] nationwide.
>
> 2006
> Merrill Lynch acquires First Franklin [as of December 30, 2006]. **New produce releases include** RapidPurchase[TM], **50-year amortization loans** and Best Score[TM]. [Emphasis added]

232.   Such agreements with regulators are confidential and are generally not disclosed to the public, however, National City admitted to the existence of these MOUs in response to media coverage regarding the existence of the agreements.  According to the Federal Reserve Examination Manual for U.S. Branches and Agencies of Foreign Banking Organizations, an MOU qualifies as an "informal enforcement action."  The Federal Reserve manual describes an MOU as follows:

> A Memorandum of Understanding is a more formally designed action, though still not a binding legal document, that incorporates even greater specificity concerning the measures being taken to

resolve problems than found in a Commitment Letter. **A Memorandum of Understanding suggests a higher level of supervisory concern** over that of a Commitment Letter. It generally must be signed by senior officials from the head office.[54] [Emphasis added]

233.   The FDIC has a similar definition of an MOU, as illustrated by the following excerpt taken from Section 13.1 of the FDIC Risk Management Manual of Examination Policies:

> The memorandum of understanding is a means of seeking informal corrective administrative action from **institutions considered to be of supervisory concern**, but which have not deteriorated to the point where they warrant formal administrative action. It is the policy of the Division of Supervision that matters in need of corrective action within such institutions should be addressed in the form of a memorandum of understanding. This is in lieu of the use of letter agreements, board resolutions passed at the request of the Regional Director, or other forms of bilateral or unilateral agreements. [Emphasis added]

234.   The FDIC Manual described above specifically states regarding institutions subject to an MOU: "their weaknesses are such that if not properly addressed and corrected, deterioration could concur."[55]  In fact, it appears that the exposure to significant risks and other problems at National City existed well before the bank began to take significant losses toward the end of 2007 and the first quarter of 2008, yet went undisclosed until the losses began piling up.  Moreover, it appears that National City management continued to allow the problems at the bank to continue to mount to the extent that National City's regulators, as late as April/May 2008, have expressed enough concern over the deterioration (and possible future deterioration) to issue MOUs.

---

[54] Federal Reserve Examination Manual for U.S. Branches and Agencies of Foreign Banking Organizations, Section 2040.1

[55] FDIC Risk Management Manual of Examination Policies, Section 13.1

235.    While National City has attempted to downplay the significance of the MOUs, the significance of these actions must not go unnoticed.   According to the *Wall Street Journal*, MOUs give banks "an opportunity to work with federal regulators to address **serious financial problems** without triggering alarm among depositors."[56] [Emphasis added]  The article went on to stress that MOUs "**are considered serious and are fairly rare**."[57] [Emphasis added]

**Summary of Conduct and Allegations**

236.    At all relevant times, Defendants knew or should have known that National City stock was an imprudent investment for the Plan as a result of National City's massive losses in connection with subprime lending, Construction Loans, Home Equity Loans and other highly risky lending practices.

237.    Through their high-ranking positions within the Company—especially the Director Defendants and executive-members of the Administrative Committee, Defendants knew or should have known of the existence of the above-mentioned problems.

238.    During the Class Period, Defendants were in a much better position than Plaintiffs and the Class to know the condition of the Company, including the true impact of these problems on the Company's financial condition.

239.    Defendants, however, took no action to protect the retirement savings of Plan Participants, as the Company's stock price continuously declined.  As a result of the enormous erosion of the value of Company stock, the Plan's participants, whose retirement savings were heavily invested in National City stock, suffered unnecessary and unacceptable losses.

---

[56] "National is Under U.S. Scrutiny," *Wall Street Journal*, Damian Paletta, David Enrich and Valerie Bauerlien, June 6, 2008

[57] "National is Under U.S. Scrutiny," *Wall Street Journal*, Damian Paletta, David Enrich and Valerie Bauerlien, June 6, 2008

240.    In addition, upon information and belief, Defendants failed to adequately review the performance of the other fiduciaries of the Plan to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA.  Defendants also failed to conduct an appropriate investigation into whether National City stock was a prudent investment for the Plan and, in connection therewith, failed to provide the Plan's participants with information regarding National City's deep-rooted problems so that participants could make informed decisions regarding whether to include National City stock in the Plan.

241.    An adequate (or even cursory) investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in National City stock, under these circumstances, was clearly imprudent.  A prudent fiduciary, acting under similar circumstances, would have acted to protect participants against unnecessary losses, and would have made different investment decisions.

242.    Because Defendants knew or should have known that National City stock was not a prudent investment option for the Plan and because Defendants were fiduciaries of the Plan, they had an obligation to protect the Plan and their participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in National City stock.

243.    Defendants had available to them several different options for satisfying this duty, including: making appropriate public disclosures as necessary; divesting the Plan of National City stock; discounting further contributions to and/or investment in National City stock under the Plan; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; and/or resigning as fiduciaries of the Plan to the extent that as a result of their employment by National City they could not loyally

serve the Plan and its participants in connection with the Plan's acquisition and holding of National City stock.

244.     Despite the availability of these and other options, Defendants failed to take any action to protect participants from losses resulting from the Plan's enormous investment in National City stock.

245.     The true facts, which were known by defendants but concealed from the investing public during the Class Period, including the facts that:

(a)     National City was exposed to massive losses in connection with its subprime mortgage lending, primarily subprime loan originations through First Franklin;

(b)     National City was engaged in highly risky lending activities involving Construction Loans requiring no money down, a "product design defect" later admitted by National;

(c) National City was engaged in other highly risky lending practices involving so-called "affordability products," such as Home Equity Loans with no income verification requirement, which, predictably, have exposed National City to additional massive losses not limited to the subprime market;

(d)     National City failed to properly account for and disclose its loan losses in violation of Generally Accepted Accounting Principles and SEC requirements; and

(e)     The foregoing practices caused the market price of National City common stock to be artificially inflated, and caused massive losses to the Plan and the Plan accounts holding National City stock, as the market price of National City stock has declined from over 30 dollars per share at the beginning of the Class Period to approximately $15 per share in early 2008 and, currently, to approximately $5 per share.

246.   As a result of Defendants' inaccurate and misleading statements and omissions, National City's stock traded at artificially inflated prices during the Class Period.

**Defendants Knew or Should Have Known That National City Stock Was An Imprudent Investment For The Plan, Yet Did Nothing to Protect Plan Assets**

247.   At all relevant times, Defendants knew or should have known that National City stock was an imprudent investment for the Plan's as a result of National City's true level of exposure to mortgage-related losses.

248.   Through their high ranking positions within the Company - especially the Director Defendants and executive-members of the Administrative Committee Defendants knew or should have known of the existence of the above-mentioned problems.

249.   Despite the numerous problems suffered by other lenders as a result of the subprime collapse, National City downplayed its exposure to losses, as the mortgage and housing markets steadily slumped.

250.   During the Class Period, Defendants were in a much better position than Plaintiffs and the Class to know the condition of the Company, including the true impact of the problems within the housing and mortgage markets on the Company's financial condition.

251.   However, Defendants took no action to protect the retirement savings of Plan participants, as the Company's stock price continuously declined.  As a result of the enormous erosion of the value of Company stock, the Plan's participants, the retirement savings of whom was heavily invested in National City stock, suffered unnecessary and unacceptable losses.

252.   In addition, upon information and belief, Defendants failed to adequately review the performance of the other fiduciaries of the Plan to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA.  Defendants also failed to conduct an appropriate investigation into whether National City stock was a prudent investment for the Plan and, in

connection therewith, failed to provide the Plan's participants with information regarding National City's deep-rooted problems so that participants could make informed decisions regarding whether to include National City stock in the Plan.

253.   An adequate (or even cursory) investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in National City stock, under these circumstances, was clearly imprudent.  A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made different investment decisions.

254.   Because Defendants knew or should have known that National City stock was not a prudent investment option for the Plan and because Defendants were fiduciaries of the Plan, they had an obligation to protect the Plan and their participants from unreasonable and entirely predictable losses incurred as a result of the Plan' investment in National City stock.

255.   Defendants had available to them several different options for satisfying this duty, including: making appropriate public disclosures as necessary; divesting the Plan of National City stock; discontinuing further contributions to and/or investment in National City stock under the Plan; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; and/or resigning as fiduciaries of the Plan to the extent that as a result of their employment by National City they could not loyally serve the Plan and its participants in connection with the Plan's acquisition and holding of National City stock.

256.   Despite the availability of these and other options, Defendants failed to take any action to protect participants from losses resulting from the Plan's enormous investment in National City stock.

**Defendants Also Caused The Plan to Engage In Prohibited Transactions**

257.    Throughout the Fund Period, Defendants caused the Plan to invest in Allegiant Funds when Defendants knew or should have known that less costly, better-performing comparable funds were available from unaffiliated financial services companies.

258.    The Administrative Committee Defendants are responsible for selecting investment and service providers for the Plan, which selections must be made prudently and solely in the interest of the Plan's participants and beneficiaries.

259.    The Administrative Committee Defendants had the sole discretion to select the investments available under the Plan.  Over many years, the Administrative Committee Defendants used that discretion to direct hundreds of millions of dollars of Plan assets into Allegiant Funds.

260.    National City subsidiaries and affiliates received millions of dollars in annual fees from the Plan.

261.    The Administrative Committee Defendants knew or should have known that comparable investment funds and retirement trustee services were available from unaffiliated entities.

262.    The Plan's investments in Allegiant Funds were prohibited transactions under ERISA, as were payments of fees to other National City subsidiaries and affiliates like the Plan's trustee National City Bank.

263.    The Plan has suffered millions of dollars in losses because the Administrative Committee Defendants forced the Plan to invest in Allegiant Funds, resulting in millions of dollars of revenue for National City while delivering poor investment returns for the Plan. ERISA prohibits a plan from investing in the plan sponsor's investment products or paying the

plan sponsor fees for services provided to the plan unless the fiduciary or sponsor can prove that the transactions are exempt.   Even if the Administrative Committee Defendants can prove the transactions are exempt from ERISA § 406, 29 U.S.C. § 1106, ERISA does not permit such arrangements when they are not solely in the interest of the plan or when a prudent, unconflicted fiduciary would choose differently.

264.   As a plan sponsor, National City was a party-in-interest and as a plan administrator, it was a fiduciary.   Through its Board, National City also appointed and monitored the members of the Committee.   National City knew or should have known that the Administrative Committee Defendants were breaching their duties under ERISA and engaging in prohibited transactions by causing the Plan to do business with National City subsidiaries and affiliates.   National City participated in the Administrative Committee's ERISA violations and must disgorge all monies received from the Plan and profits earned by National City thereon.

265.   National City Bank, as trustee for the Plan, was a fiduciary to the Plan.   It benefited from and executed transactions between the Plan and National City Bank and Allegiant Funds.   National City Bank knew or should have known that the Administrative Committee Defendants were breaching their duties under ERISA and engaging in prohibited transactions by causing the Plan to do business with National City subsidiaries and affiliates.

**Defendants Suffered From Conflicts of Interest**

266.   National's SEC filings, including Form DEF 14A Proxy Statements, during the Class Period, make clear that a significant percentage of the CEO's and other Company Officers' compensation was in the form of stock option awards.

267.   Because the compensation of at least several of the Defendants was significantly tied to the price of National stock, Defendants had incentive to keep the Plan's assets heavily

invested in National stock on a regular, ongoing basis.  Elimination of Company stock as an investment option/vehicle for the Plan would have reduced the overall market demand for National stock and sent a negative signal to Wall Street analysts; both results would have adversely affected the price of National stock, resulting in reduced compensation for the Defendants.

268.    Defendants were also motivated by the compensation agreements of National. Defendants' compensation was in large part determined by the reported financial performance of the Company:

> National believes that the major portion of executive compensation should be delivered in the form of variable pay (annual and long-term incentives) that is contingent on the financial success of the organization.

| Name and Principal Position | Year | Salary | Bonus | Stock Awards | Options Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|---|---|
| Daberko - Chairman, CEO | 2006 | 1,000,000 | 0 | 1,883,237 | 2,658,372 | 3,036,000 | 0 | 500,671 | 9,078,280 |
| Kelly - Vice Chairman, CEO | 2006 | 555,000 | 337,906 | 1,722,995 | 312,591 | 1,544,018 | 384,573 | 137,768 | 4,994,851 |
| Raskind - President | 2006 | 570,000 | 163,861 | 1,368,059 | 311,229 | 1,606,575 | 223,384 | 97,220 | 4,340,328 |

269.    Some Defendants may have had no choice in tying their compensation to National stock (because compensation decisions were outside of their hands), but Defendants did have the choice of whether to keep the Plan participants' and beneficiaries' retirement savings tied up to a

large extent in National stock or whether to properly inform participants of material negative information concerning the above-outlined Company problems.

270.     These conflicts of interest put the Defendants in the position of having to choose between their own interests as executives and stockholders, and the interests of the Plan Participants and Beneficiaries, whose interests the Defendants were obligated to loyally serve with an "eye single" to the Plan. *See generally Hill v. BellSouth.*, 313 F. Supp. 2d 1361, 1369-70 (N.D. Ga. 2004).

271.     At least one of the Defendants cashed in by disposing a substantial amount of his own personal holdings in National stock during the Class Period.  In March 2007, before the Company's stock price began to drop, Defendant Daberko personally reaped over **$15,000,000** by selling his own Company stock and/or exercising stock options.  While Defendant Daberko protected his own personal assets, upon information and belief, he did nothing to protect the Plan or its participants' assets.

## CLAIMS FOR RELIEF UNDER ERISA

272.     At all relevant times, Defendants were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

273.     ERISA § 502(a)(2), 29 U.S.C. §1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. §1109.

274.     ERISA § 409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through

use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

275.    ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan *solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence* under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. (Emphasis added)

276.    These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the *duties of loyalty, exclusive purpose and prudence* and are the "highest known to the law."  They entail, among other things:

>    a.    The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;

>    b.    A duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;

>    c.    A duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of

participants and beneficiaries.

277.    ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary,"

provides, in pertinent part, that:

> …in addition to any liability which he may have under any other
> provision of this part, a fiduciary with respect to a plan shall be
> liable for a breach of fiduciary responsibility of another fiduciary
> with respect to the same plan in the following circumstances: (A) if
> he participates knowingly in, or knowingly undertakes to conceal,
> an act or omission of such other fiduciary, knowing such act or
> omission is a breach; (B) if, by his failure to comply with section
> 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his
> specific responsibilities which give rise to his status as a fiduciary,
> he has enabled such other fiduciary to commit a breach; or (C) if
> he has knowledge of a breach by such other fiduciary, unless he
> makes reasonable efforts under the circumstances to remedy the
> breach.

278.    Plaintiffs therefore bring this action under the authority of ERISA §502(a) for

Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the

breaches of fiduciary duties by the Defendants for violations under ERISA §404(a)(1) and

ERISA §405(a).

## COUNT I

**Failure to Prudently and Loyally Manage the Plan's Assets**
**(Breaches of Fiduciary Duties in Violation of ERISA § 404 and § 405 by All Defendants)**

279.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this

Complaint as if fully set forth herein.

280.    At all relevant times, as alleged above, all Defendants were fiduciaries within the

meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in they exercised discretionary

authority or control over the administration and/or management of the Plan or disposition of the

Plan's assets.

281.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested.  Defendants were responsible for ensuring that all investments in the Company stock in the Plan were prudent and that such investment was consistent with the purpose of the Plan.  Defendants are liable for losses incurred as a result of such investments being imprudent.

282.    A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.  ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

283.    Defendants breached their duties to prudently and loyally manage the Plan's assets.  During the Class Period these Defendants knew or should have known that the Company stock was not a suitable and appropriate investment for the Plan as described herein.  Investment in the Company stock during the Class Period clearly did not serve the Plan's purpose of helping participants save for retirement, and in fact caused significant losses/depreciation to participants' retirement savings.

284.    During the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps to protect Plan participants from the

inevitable losses that they knew would ensue as the non-disclosed material problems, concerns and business slowdowns took hold and became public.

285.    The Defendants also breached their co-fiduciary obligations by, among their other failures: knowingly participating in, or knowingly undertaking to conceal, the other Defendants failure to disclose crucial information regarding the Company's operations and artificial inflation of the price of the Company stock.   Defendants had knowledge of such breaches by other Plan fiduciaries, yet made no effort to remedy the same.

286.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.

287.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

**Failure to Adequately Inform the Plan's Participants About the True Risk and Return Characteristics of National Stock
(Against All Defendants)**

288.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

289.    During the Class Period Defendants failed to adequately inform the Plan's Participants about the true risk and return characteristics of National City stock as required by ERISA.

290.    During the Class Period, Defendants issued to Participants Summary Plan Descriptions and other written communications, including SEC filings, which failed to disclose, among other things, the facts that;

(a)    National City was exposed to massive losses in connection with its subprime mortgage lending, primarily subprime loan originations through First Franklin;

(b)    National City was engaged in highly risky lending activities involving Construction Loans requiring no money down, a "product design defect" later admitted by National City;

(c)    National City was engaged in other highly risky lending practices involving so-called "affordability products," such as Home Equity Loans with no income verification requirement, which, predictably, have exposed National City to additional massive losses not limited to the subprime market;

(d)    National City failed to properly account for and disclose its loan losses in violation of Generally Accepted Accounting Principles and SEC requirements; and

(e)    The foregoing practices caused the market price of National City common stock to be artificially inflated, and caused massive losses to the Plan and the Plan accounts holding National City stock, as the market price of National City stock has declined from over 30 dollars per share at the beginning of the Class Period to approximately $15 per share in early 2008 and, currently, to approximately $5 per share.

## COUNT III

### Failure to Adequately Monitor Other Fiduciaries and
### Provide Them with Accurate Information
### (Breaches of Fiduciary Duties in Violation of ERISA § 404
### by National City & Director Defendants)

291.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

292.    At all relevant times, as alleged above, National City and the Director Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

293.     At all relevant times, as alleged above, the scope of the fiduciary responsibility of National City and the Director Defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries, including the members of the Administrative Committee.

294.    The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries.  In this case, that means that the monitoring fiduciaries, National City and the Director Defendants, had the duty to:

(1)    Ensure that the monitored fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of the Plan's participants;

(2)    Ensure that the monitored fiduciaries are provided with adequate financial resources to do their job;

(3)    Ensure that the monitored fiduciaries have adequate information to do their job of overseeing the Plan's investments;

(4)    Ensure that the monitored fiduciaries have ready access to outside, impartial advisors when needed;

(5)    Ensure that the monitored fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plan's investment options; and

(6)    Ensure that the monitored fiduciaries report regularly to the Company and/or the Director Defendants.  The Company and/or Director Defendants must then review, understand, and approve the conduct of the hands-on fiduciaries.

295.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of a plan's assets, and must take prompt and effective action to protect a plan and its participants when they are not.  In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage a plan and a plan's assets.

296.    National City and the Director Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business problems alleged above, which made Company stock an imprudent retirement investment, and (b) failing to ensure that the monitored fiduciaries completely appreciated the huge risk of significant investment of the retirement savings of rank and file employees in Company stock, an investment that was imprudent and subject to

inevitable and significant depreciation.  National City and the Director Defendants knew or should have known that the fiduciaries they were responsible for monitoring were (i) imprudently allowing the Plan to continue offering National City stock as an investment alternative for the Plan, and (ii) continuing to invest the assets of the Plan in National City stock when it no longer was prudent to do so.  Despite this knowledge, National City and the Director Defendants failed to take action to protect the Plan, and concomitantly the Plan's participants, from the consequences of these fiduciaries' failures.

297.   In addition, National City and the Director Defendants, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition of National City that they knew or should have known that these Defendants needed to make sufficiently informed decisions.  By remaining silent and continuing to conceal such information from the other fiduciaries, these Defendants breached their monitoring duties under the Plan and ERISA.

298.   National City and the Director Defendants are liable as co-fiduciaries because they knowingly participated in the each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

299.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiffs and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investments.

300.   Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT IV

### Breach of Duty to Avoid Conflicts of Interest
### (Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 by the Director Defendants and Administrative Committee Defendants)

301.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

302.    At all relevant times, as alleged above, the Director Defendants and Administrative Committee Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

303.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

304.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to timely engage independent fiduciaries who could make independent judgments concerning the Plan's investments in the Company's own securities; and by otherwise placing their own and/or the Company's interests above the interests of the participants with respect to the Plan's investment in the Company's securities.

305.    As a consequence of Defendants' breaches of fiduciary duty, the Plan suffered tens of millions of dollars in losses.  If Defendants had discharged their fiduciary duties to prudently manage and invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary

duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investments.

306.     Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

Breach Of Fiduciary Duty By The Committee Defendants Causing The Plan To Invest In Allegiant Funds

## COUNT V

### Breach Of Fiduciary Duty By The Administrative Committee Defendants Causing The Plan To Invest In Allegiant Funds
### (ERISA § 404, 29 U.S.C. § 1104)

307.     Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

308.     At all relevant times, the Administrative Committee Defendants acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by exercising authority and control with respect to the management of the Plan and the Plan's assets.

309.     The Administrative Committee Defendants, by their actions and omissions in authorizing or causing the Plan to invest in Allegiant Funds and purchase products and services from National City subsidiaries and affiliates, and to pay investment management and other fees in connection therewith, to National City subsidiaries and affiliates, put National City's financial interests ahead of the Plan's interests.  Thus, the Administrative Committee Defendants breached their duties of prudence and loyalty to the Plan under ERISA § 404(a)(1)(A), (B), 29 U.S.C. § 1104(a)(1)(A), (B).

310.   As a direct and proximate result of these breaches of duty, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, lost millions of dollars to National City fees and inferior returns.

311.   Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409(a), 29 U.S.C. § 1109(a), the Administrative Committee Defendants are liable to restore all losses suffered by the Plan caused by their breaches of fiduciary duty.

### COUNT VI

### Prohibited Transaction Violations
### (ERISA § 406, 29 U.S.C. § 1106)

312.   Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

313.   At all relevant times, the Administrative Committee Defendants acted as a fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by exercising authority and control with respect to the management of the Plan and Plan's assets.

314.   The Administrative Committee Defendants, by their actions and omissions in authorizing or causing the Plan to invest in Allegiant Funds and purchase National City-affiliated products and services, and pay, directly or indirectly, investment management and other fees in connection therewith, caused the Plan to engage in transactions that the Administrative Committee Defendants knew or should have known constituted sales or exchanges of property between the Plan and parties-in-interest, the furnishing of services by parties in interest to the Plan, the transactions with fiduciaries in violation of ERISA §§ 406(a), 406(b), 29 U.S.C. §§ 1106(a), 1106(b).

315.    As a direct and proximate result of these prohibited transaction violations, the Plan, directly or indirectly, paid millions of dollars in investment management and other fees that were prohibited by ERISA and suffered millions of dollars in losses annually.

316.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and 29 U.S.C. § 1109(a), Administrative Committee Defendants are liable to restore all losses suffered by the Plans as a result of the prohibited transactions and all profits earned by National City on the fees paid by the Plan to National City and its subsidiaries and affiliates.

## CAUSATION

317.    The Plan suffered at least tens of millions of dollars in losses because substantial assets of the Plan were imprudently invested, or allowed to be invested by Defendants, in Company stock during the Class Period, in breach of Defendants' fiduciary duties. These losses were reflected in the diminished account balances of the Plan's participants.

318.    Defendants are responsible for losses caused by participants' failure to exercise voluntary diversification options because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder. By failing to apprise participants of the problems within the Company and of the fact that the Company stock price was artificially inflated, as further described *infra*, Defendants misrepresented the soundness of Company stock as an investment vehicle. As a consequence, participants did not exercise independent control over their investments in the Company stock, and Defendants remain liable under ERISA for losses caused by such investment.

319.    Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, the Plan and participants would have avoided a substantial portion of the losses that they suffered through their continued investment in the Company stock.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

320.    As noted above, as a consequence of the Defendants' breaches, the Plan suffered significant losses.

321.    ERISA § 502(a), 29 U.S.C. § 1132(a) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . ."

322.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and Beneficiaries in the Plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been properly administered.

323.    Plaintiffs, the Plan, and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches

alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs and (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

324.    Each Defendant is jointly liable for the acts of the other Defendants as a co-fiduciary.

### SECTION 404(c) DEFENSE INAPPLICABLE

325.    The Plan suffered losses, and the Plaintiffs and the other Class members suffered losses, because substantial assets in the Plan were invested in National City stock during the Class Period in violation of the Defendants' fiduciary duties.

326.    As to contributions invested in Company stock, Defendants were responsible for the prudence of investments provided under the Plan during the Class Period, unless the Plan satisfied the procedural and substantive requires of ERISA § 404(c), 29 U.S.C. § 1104(c) and the regulations promulgated under it.

327.    Section 404(c) provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over investment decisions, but not for liability for the selection of imprudent investment options for the Plan.   In order for § 404(c) to apply, participants must in fact exercise "independent control" over investment decisions.   In addition, § 404(c) only applies if participants are informed that "the Plan is intended to constitute a plan described in § 404(c) and [the regulations], and that fiduciaries of the plan may be relieved of liability for any losses which are the direct and necessary result of investment instructions given by such participants or Beneficiary."   29 C.F.R. § 2550.404c-1(b)(2)(B)(1)(i)

328.    As alleged above, Defendants failed to provide participants with complete and accurate information regarding the true financial condition of National City and the prudence of such heavy investment of Plan assets in the Company Stock Fund.  Accordingly, participants failed to exercise the requisite independent control over their investment in National City stock in the Plan.

329.    In addition, § 404(c) does not apply to any portion of the Plan (1) derived from Company matching or profit-sharing contributions as those investments/investment vehicles were made/invested by/through the sole discretion of the Company or (2) deemed an ESOP in that the Secretary of Labor has interpreted the provision to apply only to plan that provide plan participants with a full range of investment options, which an ESOP by its very nature does not. *See* 29 C.F.R. § 2550.404c-1 (1996); *Herman v. Nationsbank Trust Co*., 126 F.3d 1354, 1361 (11th Cir. 1997).   Under the terms of the Plan, Company contributions were automatically initially invested in the Company Stock Fund; thus, participant control was restricted.

330.    The Defendants' liability to the Plan, Plaintiffs and the Class for relief stemming from the Plan's imprudent investments in National City stock, is established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plan during the Class Period, without regard to whether or not the participants relied upon statements, acts, or omissions of Defendants.

## JURY DEMAND

331.    Plaintiffs demand trial by jury of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

A.      A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.      A Declaration that the Defendants, collectively and separately, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.      Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

F.      An Order that Defendants allocate the Plan's recoveries to the accounts of all participants who had any portion of their account balances invested in the common stock of National City maintained by the Plan in proportion to the accounts' losses attributable to the decline in the stock price of National City;

G.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H       An order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

I.      An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.

Dated:  June 26, 2008

**GOLDMAN SCARLATO & KARON, P.C.**

By:    s/ Daniel R. Karon
        **Daniel R. Karon**
        55 Public Square, Suite 1500
        Cleveland, OH 44113
        Telephone: (216) 622-1851

**Interim Liaison Counsel for the Class**

**STULL, STULL & BRODY**
Edwin J. Mills
Michael J. Klein
6 East 45th Street
New York,  NY 10017
Telephone: (212) 687-7230
Facsimile:  (212) 490-2022

**SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP**
Joseph H. Meltzer
Edward W. Ciolko
Joseph A. Weeden
280 King of Prussia Road
Radnor, PA 19087
Telephone:  (610) 667-7706
Facsimile: (610) 667-7056

**Co-Lead Counsel for the Class**

James E. Arnold (0037712)
Scott J. Stitt (0073943)
**JAMES E. ARNOLD & ASSOCIATES, LPA**
471 East Broad Street, Suite 1400
Columbus, OH 43215
Telephone: (614) 460-1600
Facsimile:  (614) 469-1066

Alfred G. Yates, Jr.
**LAW OFFICES OF ALFRED G.
YATES, JR., PC**
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219

J. Brian McTigue
Gregory Y. Porter
Jennifer H. Strouf
**McTIGUE & PORTER, LLP**
5301 Wisconsin Avenue, NW, Suite 350
Washington, DC 20015
Telephone: (202) 364-6900
Facsimile: (202) 364-9960

Mark Griffin
**THE GRIFFIN LAW FIRM**
175 Honeybelle Oval
Orange, OH 44022
Telephone: (216) 346-7376
Facsimile: (216) 861-6679

Mark C. Rifkin
Matthew M. Guiney
**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ, LLP**
270 Madison Avenue
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4657

Cyrus Mehri
Janelle Carter
**MEHRI & SKALET, PLLC**
1250 Connecticut Avenue, NW, Suite 300
Washington, DC 20036
Telephone: (202) 822-5100
Facsimile: (202) 822-4997

Major Khan
**MAJOR KHAN, LLC**
20 Bellevue Street
Weehawken, NJ 07086
Telephone: (646) 546-5664
Facsimile: (646) 546-5755

Thomas J. McKenna
**GAINEY & McKENNA**
295 Madison Avenue
New York, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383

Ronald S. Kravitz
**LINER YANKELEVITZ SUNSHINE &
REGENSTREIF, LLP**
199 Fremont Street, 20th Floor
San Francisco, CA 94105-2255
Telephone: (415) 489-7700
Facsimile: (415) 489-7701

Laurence Powers
**POWERS FRIEDMAN LINN, PLL**
23240 Chagrin Boulevard, Suite 180
Cleveland, OH 44122-5469
Telephone: (216) 514-1180
Facsimile: (216) 514-1185

R. Eric Kennedy
Daniel P. Goetz
**WEISMAN KENNEDY & BERRIS CO.,
LPA**
Midland Building
101 Prospect Avenue
Cleveland, OH 44115
Telephone: (216) 781-1111

Samuel H. Rudman
David A. Rosenfeld
Mark Reich
Mario Alba, Jr.
**COUGHLIN STOIA GELLER
RUDMAN & ROBBINS, LLP**
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: (631) 367-7100
Facsimile: (631) 367-1173

**Attorneys for Plaintiffs**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 26, 2008, a copy of foregoing Consolidated Complaint for Violations of ERISA was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's system.


<u>s/ Daniel R. Karon</u>
Daniel R. Karon
Goldman, Scarlato & Karon
55 Public Square, Suite 1500
Cleveland, OH 44113
Phone: (216) 622-2995
Fax: (216) 622-1582
E-mail: karon@gsk-law.com